IBIS ENTERPRISES, LIMITED, and Rand Development Corporation, Plaintiffs,

v.

SPRAY–BILT, INC. and David H. Richman, Defendants.

Civ. No. 10648–M.

United States District Court
S. D. Florida,
Miami Division.

May 24, 1963.

Fowler, White, Gillen, Humkey & Trenam, Miami, Fla., and Byerly, Townsend, Watson & Churchill, New York City, for plaintiffs.

John Cyril Malloy, Miami, Fla., for defendants.

McRAE, District Judge.

In accordance with the Findings of Fact and Conclusions of Law entered herein, it is

Ordered, adjudged and decreed that:

1. The said Findings of Fact and Conclusions of Law are hereby adopted and made a part of this Final Judgment.

2. Each of the Defendants is hereby enjoined from any further infringement of claims One (1) through Six (6) of patent No. 2,933,125 and claim Eleven (11) of patent No. 2,787,314.

3. The Plaintiffs recover from the Defendants damages to be determined after an accounting in a sum adequate to compensate the Plaintiffs for the infringement and contributory infringement by the Defendants of the Plaintiffs' patents in suit No. 2,933,125 and 2,787,-314.

4. The Plaintiffs recover from the Defendants damages to be determined after an accounting in a sum adequate to compensate the Plaintiffs for all unfair competition and trade by the Defendants against the Plaintiffs.

5. The Plaintiffs herein recover from the Defendants cost and disbursements to be hereinafter taxed.

### FINDINGS OF FACT

1. *Parties*

Plaintiff Ibis Enterprises, Limited, is a corporation of Bermuda. Plaintiff Rand Development Corporation is a corporation of Ohio and has a principal place of business at Cleveland, Ohio. Defendant Spray-Bilt Inc., is a corporation of Florida and has a principal place of business at Hialeah, Florida. Defendant David H. Richman is an individual residing in Miami, Florida. Plaintiff Ibis Enterprises, Limited, is the owner of the two patents in suit. Plaintiff Rand Development Corporation is the exclusive licensee of Ibis Enterprises, Limited, under the patents in suit and shares the profits derived from said patents with Canadian Ingersoll Rand Company, a subsidiary of Ingersoll Rand Company.

2. *Civil Action*

This is a civil action for infringement of United States Patent No. 2,933,125 filed on August 6, 1953 and granted on April 19, 1960 and United States Patent No. 2,787,314 filed on October 13, 1954 and issued April 2, 1957, and for unfair competition in trade. Patent No. 2,933,-125 is the main or basic patent and relates to methods and apparatus for the simultaneous deposition of fiber reinforced plastic; patent No. 2,787,314 relates to improvement on the methods and apparatus of the main patent. This action was commenced on April 4, 1961.

3. *Background of Patentee*

David F. Anderson, the patentee of the patents in suit, is a man of attainments and undenied qualifications. He is a British educated graduate engineer, and he served as a group captain in the Royal Air Force during World War II and did experimental and test work because of his engineering background (Anderson Tr. pp. 9–12). Following his retirement from the Air Force, Anderson formed Fiberlast of Canada, a Canadian Corporation (Anderson Tr. pp. 9–12, 51–52) which acquired exclusive rights under the "Vidal" process for forming glass reinforced plastic articles. Anderson became familiar with the several other commercial processes then in use for forming such articles, each of which processes may be grouped in one of two types: "hand lay-up" and "matched die (or metal) mold" (Anderson Tr. 208–220; Tr. 163–166).

4. *Prior Art Hand Lay-Up Method*

The "Vidal" process involved, in part, the "hand lay-up" process of laboriously hand tailoring and fitting of fiberglass cloth or mat (Exhibit 8) on a mold, hand mixing small batches of a catalyst, promoter and liquid resin mixture which

was poured on the tailored cloth. It was necessary to mix these components in small batches from time to time, as the liquid resin solidified within a short time once the setting components of catalyst and accelerator were added. In the "Vidal" process the resin and cloth were covered with a cellophane sheet, and pressure was then applied thereto to distribute the resin (Anderson Tr. p. 52). In the hand lay-up process the plastic was distributed and air bubbles were removed by hand brushing or rolling (Tr. pp. 87, 164, 165; Anderson Tr. pp. 214, 215).

## 5. *Prior Art Matched Metal Mold Method*

(a) Another process then in use for forming glass reinforced plastic articles was the so-called "matched metal mold" or "matched die" process. This process involved the use of a male mold and a complementary female mold. A preform, which comprised chopped strands of fiberglass held loosely in position by a binder of starch or resin and had a general conformation of the molds (Trial Exhibit 17.1), was then placed on one of the molds; resin, catalyst and promoter were then mixed and poured onto the preform; and finally, the other mold was pressed onto the first mold, squeezing the preform and thereby distributing the resin and forming the resultant plastic article (Tr. pp. 73, 114; Rand Tr. pp. 175, 176).

(b) The fabrication of a preform used in this process is a separate process in which glass roving, a rope-like material made up of several strands of glass loosely held together (Patent No. 2,933,-125, Column 1, lines 21–29), is cut and blown onto a screen having the general conformation of one of the matched metal molds. A vacuum within the screen draws the glass fibers onto the screen. After or during deposit of the fibers on the screen, the fibers are lightly coated with either a powdered or liquid resin or starch merely to hold the fibers together to permit gentle handling of the preform (Tr. pp. 112–114).

## 6. *Anderson Early Work and Invention*

(a) Anderson was dissatisfied with the hand lay-up process because of the hand mixing of resins and setting components, the mess created by pouring and spreading the liquid plastic, and the tedious and time-consuming work required to tailor and drape the fiberglass mats to fit compound curves on the mold (Anderson Tr. pp. 54–56). He was further satisfied that he could devise a way to eliminate the expense of preform preparation and the high costs and the limited scope of application associated with the molding step required in the "matched metal mold" process (Anderson Tr. p. 59).

(b) Anderson struggled with this problem, experimenting with tailoring mat, blowing fibers into a stream of premixed plastic, and spraying admixed plastic on tailored mats (Anderson Tr. 53–59). He finally solved the problem associated with the then existing various methods of forming glass reinforced plastic articles by the invention of apparatus and process of simultaneous deposition of chopped fiberglass and liquid plastic. A full and written description of the invention and apparatus was sent to C. A. Adee in the United States in July, 1952, which serves as a basis for the application for patent 2,933,125 (Tr. pp. 201–203).

## 7. *Patent in Suit No. 2,933,125*

(a) The apparatus (claims numbered 1, 3 and 6) of the patents in suit is described by the following passages from the specification of patent No. 2,933,125:

"the depositor is shown as comprising a self-feeding cutter 10 mounted on and driven by a motor 11. Fiber rope, or roving, is guided by a feed pipe 12 into one side of the cutter 10 wherein the roving is cut into the desired lengths and ejected from the opposite side of the cutter 10. Mounted on the opposite ends of the cutter frame 13 are spray guns 14 arranged to direct a spray of atomized plastic on the fiber cuttings ejected from the cutter 10. The sizes

and weights of the cutter 10, motor 11 and spray guns 14 are such that the depositor may be hand-held and readily manipulated by the operator to direct a continuous stream of plastic impregnated fiber against a form or mold to build up a lamina of the reinforced plastic article being fabricated." (Column 2, lines 39–52.)

The form of cutter described in the patent comprises a pair of cylindrical rollers parallel to and in frictional contact with each other. One of the rollers is driven by the motor and in turn drives the other roller by the frictional contact between them. One cutter roller has a cutting element like a razor blade imbedded in circumferential spaced relation so as to cut roving passing in between the rollers (Patent 2,933,125, column 2, lines 39–72, column 3, lines 1–19).

(b) The methods (claims numbered 2, 4 and 5) of patent No. 2,933,125 are described by the following passages from its specifications:

"The present invention includes the method of, and a hand-held device for cutting roving into desired lengths, ejecting the cut fiber into a spray of resin and then depositing the impregnated roving on a mold. By cutting the fiber, impregnating it and applying it all in one operation, the operator may readily deposit directly on to the mold only the appropriate quantities of fiber and activated resin thereby reducing to a minimum wastage of resin, fillers and pigment. Moreover, with this invention the resin and its setting components are mixed only at the point of actual use and hence only as needed." (Column 1, lines 55–65.)

When polyester resin is activated by being mixed with an accelerator and a catalyst, there is a change from a liquid to a solid within a few minutes. In the practice of the process of the patents in suit, the setting components of the accelerator and promoter are contained in separate sprays. The setting components of the liquid plastic are thus mixed only upon the meeting and commingling of the sprays of liquid plastic (Patent 2,933,125, Column 4, lines 19–27; Claim 6).

8. *Anderson Inventions Filled Need of Industry*

(a) Others recognized the need for new and better apparatus and processes in the field of glass-reinforced plastic. After observing a demonstration of the Anderson apparatus and process, Owens-Corning Company, a leading manufacturer of fiberglass in the United States, offered to help Anderson to promote his inventions as this was "exactly what the industry has been wanting. This may be the shot in the arm it required." (Anderson Tr. pp. 237–238.)

(b) In September, 1957, Anderson demonstrated his inventions to Rand Development Corporation of Cleveland, Ohio, which was then using the hand lay-up process to form experimental plastic parts for a client. Rand promptly conducted tests to evaluate the physical properties of glass-reinforced plastic laminate formed with the Anderson apparatus and using the patented process, and it found them to be equal or superior to those of laminate produced by the hand lay-up and the matched die methods (Tr. pp. 68–73, 76, 110–111). Rand Development Corporation interviewed fiberglass companies and resin companies and consulted with its patent counsel to satisfy itself that the process and the apparatus were new and novel (Rand Tr. pp. 8–10; Tr. pp. 115–116). Rand Development Corporation then obtained an exclusive license under such patents (Plaintiffs' Exhibit Nos. 3E (1), (2), (3); Tr. p. 76), and it began to manufacture apparatus under the Anderson patents and applications (Tr. pp. 77–78).

(c) The apparatus and the methods disclosed and claimed in Patents Nos. 2,787,314 and 2,933,125 clearly fulfilled a long felt need in the art for an improved, cheaper, cleaner and more efficient apparatus and method for forming a glass-reinforced plastic laminate (Ander-

son Tr. pp. 237–238), as there was immediate and widespread interest in this apparatus and process following its announcement to the public by Rand Development Corporation (Eldred Tr. p. 36; Tr. p. 114). This was followed by commercial success of these inventions (Tr. pp. 78, 118). Many leading and important members of the industry such as Boeing Aircraft, Douglas Aircraft, Flintkote Company, Morrison & Knudson, and Brunswick Balk Corporation have acquired licenses from Rand Development Corporation to make use of the inventions of the patents in suit (Tr. pp. 78–79). A new section of the industry, "spray-up," was born (Tr. pp. 115–116).

**9.** *Advantages of Inventions over Hand Lay-Up and Matched Die Mold*

(a) The undisputed advantages of the inventions in suit over the "hand lay-up" method are:

(1) Elimination of sticky substance poured from pitchers, which made the reinforced plastic molding plants among the most unpleasant places in industry to work (Plaintiffs' Ex. No. 50, Modern Plastics Magazine, March 1951, p. 57, col. 3; Tr. pp. 91, 93).

(2) Elimination of delamination which may occur between one of several layers of woven mat and cloth (Tr. pp. 90–91).

(3) Use of a cheaper form of fiberglass and reduced glass waste (Plaintiffs' Ex. No. 7, Patent No. 2,933,125, Column 1, lines 46, 47. Plaintiffs' Exhibit 7 vs. 8 and 9).

(4) Elimination of laborious and repeated hand mixing of small batches of promoter, catalyst and resin (Rand Tr. pp. 180–181).

(5) Elimination of seams, joints and overlap in hand tailoring of cloth or mat, particularly on complex compound curves or depressions (Tr. p. 69; Rand Tr. p. 181).

(6) Cost and time savings (Rand Tr. p. 8; Tr. p. 86).

(7) Wider areas of application, such as overhead fabrication or coating (Tr. pp. 101, 102, 109).

(8) Thorough wetting of all fibers, with the resulting attainment of more uniform strength of the laminate (Tr. pp. 110–112).

(b) The undisputed advantages of the inventions of the patents in suit over the "matched metal mold" process are:

(1) The final article is manufactured in one operation, whereas in the matched metal molding process a series of separate steps is required. (Tr. pp. 73, 112–114 Patent No. 2,933,125 Column 1 lines 55–65.)

(2) A product of greater fiberglass-resin uniformity results from use of the Anderson process, particularly in the case of an article having compound curves. (Tr. pp. 110–111.)

(3) The Anderson process does not require fixed and immovable mechanical apparatus; it can easily be transported to the work site. (Tr. pp. 108–109.)

(4) The "matched metal mold" process requires expensive matched metal dies (Tr. pp. 75–76) which obviously must be changed each time any alteration is made in the article to be formed, thereby requiring a substantial investment in equipment and rendering it relatively inflexible.

(5) The Anderson process can be applied to many areas of manufacture and application of fiberglass reinforced plastic materials which are completely impossible for the "matched metal mold" process (Tr. pp. 108–109.)

**10.** *Defendants Proclaimed Great Advantages of Inventions*

Since early 1959 each of the Defendants has continuously and extensively

published to the public material extolling the many new and varied uses of the new spray-up process of the patents in suit and of the admittedly infringing apparatus for carrying out this process. They have continuously proclaimed its great advantages and merits as being "the greatest improvement in the history of reinforced plastic industry." (Davis Tr. pp. 44–45; Richman Tr. pp. 44, 382; Plaintiffs' Miami Deposition Ex. No. 34, 37, 38, 39; 74c.)

**11.** *Defendants were Licensees Under Patents in Suit*

(a) During 1958, Defendant David H. Richman was employed as sales manager with Fabulous Fiberglas, Inc., a licensee of the Plaintiff Rand Development Corporation under the patents and pending applications for patents on the Anderson process and apparatus (Richman Tr. pp. 25–35).

(b) Thereafter in 1959 the Defendants David H. Richman and Spray-Bilt, Inc., became sales agents of Plaintiff Rand Development Corporation (Plaintiffs' Ex. No. 28; Tr. p. 295; Richman Tr. p. 210). Each of the Defendants, while acting as such agents, advertised and lauded to the public their contractual relationship with Rand and the patents on the Rand produced apparatus and the Anderson patented method, and they subsequently terminated their contractual relationship with the Plaintiff Rand but continued for several months thereafter to distribute to the public advertising material showing Rand apparatus; some of this material contained the legend "Patented Process," while making, using and selling admittedly infringing apparatus manufactured by and for the Defendants without license of Rand (Davis Tr. pp. 44–57; Plaintiffs' Miami Deposition Exhibits Nos. 20, 22, 23, 25–27, 49, 70, 71, 73, 74A, E, F, 76).

**12.** *Substance of Prior Art Asserted by Defendants Considered and Overcome in Patent Office*

(a) The prior art patents and publications introduced in evidence by the Defendants relate in substance only to subject matters or arts similar, if not identical, to those disclosed in the prior art considered by the Patent Office and overcome by Anderson during the prosecution of the applications which resulted in the Anderson patents in suit (Tr. pp. 181–197).

(b) The preform art, the hand lay-up art, and the matched metal molding process were considered by the Patent Office and overcome by Anderson during the prosecution of the application which resulted in the Anderson patents in suit (Tr. pp. 181–197; Patent No. 2,933,125, Column 1, lines 20–55).

(c) The Slayter patent No. 2,618,817, particularly singled out by the Defendants as prior art against the Anderson patents in suit, can be properly categorized as falling within the cutter art considered by the Patent Office and is no more pertinent art than that considered and cited by the Patent Office (Tr. pp. 181, 183). Further, it is undisputed that the device disclosed in the Slayter patent is inoperable to cut or break roving (Tr. pp. 282–283; Anderson Tr. pp. 167, 168). The Brennan patent, cited and introduced by the Defendants, involves a spraying of a filler and a binder for forming a radio speaker diaphragm and does not differ in substance from the Wenzel patent No. 1,718,507 considered by the Patent Office and overcome by Anderson in the prosecution of the applications for the patents in suit (Tr. pp. 279–280).

**13.** *Double Patenting Defense Considered and Overcome In Patent Office*

The defense of alleged double patenting was raised by the Defendants, but no proof was introduced in support of this defense. This defense must be based on a comparison of the claims in patent No. 2,787,314 with the claims of patent No. 2,933,125 (Tr. pp. 342–346). This issue was raised by the Patent Office and overcome by Anderson during the prosecution of the applications for the two patents in suit (Tr. pp. 197–199).

14. *The Patents in Suit Comply with Statutes*

The assertion by the Defendants that the patents in suit are invalid for failing to comply with Title 35, United States Code, Sections 111 and 112, in failing to discloses specific proportions of catalyst and accelerator to be mixed with polyester resins, and in failing to disclose motor speeds and air pressure, and in certain indefiniteness of claim language, are unsupported by any proof. It is without foundation in fact. Long before the filing of patent No. 2,933,125 there were at least twelve main manufacturers of polyester resins who produced polyester resins with accurate specifications as to mixtures and proportions with catalysts used to produce plastics having certain desired physical characteristics (Ex. No. 53, Modern Plastics Magazine, March 1951, p. 58). In 1957 Rand Development Corporation learned that anyone experienced in hand lay-up could use the Anderson apparatus and process without instructions for mixing the polyester resins, catalyst and accelerator (Tr. pp. 71, 92, 93, 130; Rand Tr. p. 168). The questions of motor speed and rates of cutting are obviously simple matters to those skilled in the art and do not require detailed disclosure.

15. *Utility Trailer Work was Unsuccessful, Imperfect and Abandoned Experiment*

(a) It is alleged that certain work by Utility Trailer Manufacturing Company, City of Industries, California, during the period 1951–1953 anticipates the Anderson inventions of the patents in suit. The record clearly shows that this work was, at best, merely an incomplete and abandoned experiment. Barker, a British-educated mechanical engineer (Barker Tr. pp. 10–11) conducted most of this work in an effort to discover a method of manufacturing plastic corner caps for use in the upper front corners of aluminum trailer vans manufactured by Utility Trailer Company (Barker Tr. pp. 15–16).

(b) The first effort of Utility Trailer involved the use of a single spray gun, through which they attempted to spray catalyzed resin, and a large fixed type chopper. The results were a complete failure "to produce anything worth working on" (Barker Tr. pp. 22–32). The second effort involved a hand-held fiberglass chopper (Plaintiffs' Los Angeles Depositions Exhibit No. 3.9), later redesigned (Barker Tr. pp. 63–66), and a double spray gun for separately spraying resin and catalyst and resin and accelerator. The operator held the chopper in one hand and the spray gun in the other. Experimental work with these two pieces of apparatus was most unsatisfactory, involving such problems as "starved" glass and trapped air which were never solved (Barker Tr. pp. 85–88).

(c) Sixteen experimental corner caps were made, and of these only a few were considered to be suitable even for experimental test installation on truck vans (Barker Tr. pp. 94, 98–99). Following this experimentation with a few test caps, the project was called to a halt by Utility Trailer Manufacturing Company (Barker Tr. pp. 113–116), and there was no further activity in the plastic field by Utility Trailer Manufacturing Company between the years 1953 and 1956 (Barker Tr. pp. 158–159) other than the purchase of plastic parts made by old and well-known methods.

(d) Utility Trailer Company at no time sold or offered for sale any apparatus similar or identical to the apparatus used by Utility Trailer in their experimental and subsequently abandoned work in the glass-reinforced plastic field (Barker Tr. pp. 113–114). Barker compared the inventions described in the patents in suit with the experimental work of Utility Trailer. He conceded that the inventions had many features superior to his experimental work, and he admitted that Anderson had succeeded where he had failed (Barker May 12 Tr. pp. 40–43).

(e) The later reversion by Utility Trailer Company to purchasing caps made by an old and well-known method of fabricating reinforced plastic articles (Barker Tr. pp. 109–1120), and the action by Utility Trailer in withdrawing

from its patent agent all materials relating to its experimental work and in failing to file a patent application on the method or apparatus while continuing its practice of filing patent application on other work of Utility Trailer (Los Angeles Deposition Exhibits Nos. 25; Plaintiff's Exhibit No. 47) constitute clear and convincing proof that the experimental work of Utility Trailer Company resulted, at best, in an imperfect device and method and was an incomplete and abandoned experiment.

16. *Alleged Bradley Defense Not Established*

(a) It is asserted by the Defendants that in early or middle 1952 R. C. Bradley, of Fort Lauderdale, Florida, constructed apparatus and practiced a method which anticipates the inventions of the patents in suit.

(b) It appears that Bradley, during a period including the year 1952, was engaged in the business of producing, among other things, plexiglass windshields which were formed on molds alleged to have been fabricated by the alleged apparatus (Bradley Tr. pp. 15, 16, 84).

(c) It is asserted by the Defendants that in the middle of 1952 the alleged Bradley apparatus and method were observed on one occasion by Kennard, on one or two occasions by Craddock, and over a longer period of time and on many occasions by Alexander.

(d) In 1952 Kennard operated a small machine shop in St. Petersburg, Florida. He testified that he first met Bradley in May, 1952, in a bar in Fort Lauderdale, Florida, and was invited to Bradley's shop to pick up the then only existing cutter holder from the alleged Bradley apparatus to use as a sample for the purpose of making new cutter holders (Kennard Tr. pp. 14–24). Kennard testified further that at that time he personally delivered to Bradley the new cutter holders plus the sample and saw the alleged apparatus (Kennard Tr. p. 22). Bradley first testified that Kennard did in fact personally deliver all of the cutter holders, and he recalled that he was operating the alleged apparatus when Kennard arrived. Later he was prompted to testify that one holder was delivered in advance, for until Kennard returned the sample Bradley could not have operated the alleged apparatus (Bradley Tr. pp. 156–157, 164).

(e) Craddock testified that while seeking a job with Bradley he visited Bradley's shop in June, 1952, and observed the alleged Bradley process and apparatus in operation (Craddock Tr. pp. 24–25).

(f) The Kennard testimony can be given little or no weight as it is inconsistent with and contradicts the testimony of Bradley, Craddock, and Alexander. Kennard identified Fort Lauderdale Exhibit 4 as the same gun which he saw in June, 1952 (Kennard Tr. p. 28). Bradley and Craddock testified that this Exhibit 4 had been modified materially in 1957 by the addition of new and different spray guns, motor tubes, supporting rods, motor base, glass guides and nipples.

(g) The Kennard testimony is further inconsistent in that he recalled within a few weeks the time of his meetings with Bradley going back ten years and involving a $60 transaction; yet his recollection concerning contemporaneous events of considerably more importance to Kennard, such as the formation of a $750,000 business, was accurate only within several years. (Kennard Tr. pp. 37–41, and pp. 43–44.)

(h) Craddock's memory is almost as inconsistent as that of Kennard. He recalled within a few weeks the dates of two alleged meetings with Bradley stated to have taken place ten years ago. These were not special occasions, but merely job hunting. When he did in fact obtain a job with Bradley some five years later and five years nearer to the date of his testimony, he was unable to recall the date of this event within a time span of less than three to six months (Craddock Tr. pp. 18, 24, 77). Moreover, his recollection of the date of an event which

had taken place only seven weeks before the taking of his deposition covered a time span of four weeks (Craddock Tr. pp. 18, 107. On March 16, 1962, Kennard testified he met with Bradley in Fort Lauderdale on March 13; on March 20, Bradley testified he "thought" Mr. Kennard came to Fort Lauderdale on March 16, and he had not seen Kennard prior to March 16 (Kennard Tr. p. 45; Bradley Tr. p. 148).

(i) The Court is not inclined to accept the stories that Bradley was caught in the act of operating his alleged apparatus by Craddock and Kennard, who just happened to drop in on Bradley in 1952 (Bradley Tr. p. 157; Craddock Tr. pp. 25–25A; Kennard Tr. p. 30). Yet an analysis of Bradley's testimony (Bradley Tr. pp. 88, 297) concerning the usage of the alleged apparatus indicates that it was operated for useful purposes 3½ to 5½ hours only throughout the entire period of 1952.

(j) Bradley, Kennard, and Craddock have an interest in the outcome of this suit. Bradley admitted that he has sold admittedly infringing apparatus to the Defendants (Bradley Tr. p. 203), that he was then in the process of moving into a new plant, and that he sells a "Glass-mate" gun which is the same in operation as the Defendants' admittedly infringing apparatus (Bradley Tr. pp. 176, 287).

(k) Craddock has worked or done contract work for Bradley continuously since 1957 and is moving to the new quarters with Bradley (Craddock Tr. pp. 67, 69 and Craddock Tr. pp. 64–69). Kennard also has done work continuously for Bradley during the past several years (Kennard Tr. pp. 34, 35, 46).

(l) Alexander has no apparent interest in the outcome of this suit. He passed through Bradley's shop at the airport at least four or five times a day on an average of three to four days a week throughout the entire period of 1952 and thereafter (Alexander Tr. pp. 9, 26). The Bradley apparatus described by Alexander was nothing more than a twin paint spray gun. No cutter, indeed no device for adding a reinforcement of any kind to the plastic, was observed by Alexander (Alexander Tr. p. 20). It is unlikely that Alexander would remember only the spray guns but not the chopper, if the chopper had then existed. The chopper is a distinct and obvious part of the present apparatus. In fact, it is one of the most obvious parts and would surely attract attention in its operation like a "windmill," spitting out a stream of chopped glass. It is most improbable that it would have been overlooked, if it had existed at that time.

(m) Alexander's testimony leads to only one conclusion. The alleged Bradley apparatus was, at the very most, only two paint spray guns, possibly used to form a plastic mold; but no glass-reinforcing material was used, other than possibly plastic chips swept from the floor and hand-thrown onto the mold (Alexander Tr. pp. 19, 20).

(n) The testimony of the witnesses Bradley and Craddock was challenged by the testimony of impeachment witnesses. On October 23, 1961, and February 7, 1962, Horten interviewed Bradley concerning the alleged early apparatus and process. Bradley advised Horten that his alleged apparatus was made in 1953 and was used in secret until at least 1957, and that neither Craddock nor Kennard had seen the gun prior to 1957 (Tr. pp. 363, 368, 370). This impeachment testimony is corroborated by the legend "1953 Model" appearing on Fort Lauderdale exhibits numbered 9A through 9D, which are photographs of the alleged Bradley apparatus, Fort Lauderdale Exhibit No. 4. Bradley placed this legend on the photograph (Tr. p. 307, Craddock Tr. p. 110). Horten's impeachment testimony was corroborated in its entirety by Leek. (Tr. p. 388).

(o) Only two documents were produced by the Defendants in an effort to sustain their position that the purported Bradley apparatus was in existence in June, 1952. Fort Lauderdale Exhibit No. 3 purports to be a receipt from Kennard of payment received from Bradley for the cutter holders alleged to have been made by Kennard (Kennard Tr. pp. 22–

23). There is nothing on the face of the document to indicate the construction or purpose of the holders.

Fort Lauderdale Exhibit No. 9 purports to be a receipt from Nick's Welding Shop relating to some welding work done by this shop. There is nothing on this receipt to indicate what was welded or that it related in any way to the Bradley apparatus. Although noticed for deposition, the author of the receipt was not produced.

### 17. *Claim 11 of Patent in Suit No. 2,787,314 Is Infringed*

(a) Claim 11 only of patent No. 2,787,314 in suit is involved in this suit. The Defendants have denied infringement. Claim 11 defines a feeding mechanism for the cutter described in Finding numbered 7(a), supra, and comprises a guide plate and a pair of parallel rollers positioned on the inlet side of the cutter. This mechanism receives a free end of roving feed through a hole in the guide plate and directs the roving into the rollers of the cutter. The purposes of this mechanism are to permit easy feeding of the roving into the cutter, to eliminate any danger of injury to the operator which is present whenever roving is fed directly into the cutter, and to prevent roving from falling free of the cutter when the operation of the cutter is interrupted (Tr. pp. 158, 159; Patent 2,787,314, Column 4, lines 18–48).

(b) In the Defendants' device, there is a single feed roller positioned on the inlet side of the cutter and parallel to one of the cutter rollers. Roving is fed through holes in a guide plate and in between these rollers and then into the cutter. This feed mechanism is of substantially the same construction and serves the identical purposes as feed mechanism of the patent in suit (Tr. p. 161).

### 18. *Defendants Palm Off Their Apparatus as Plaintiffs'*

Each of the Defendants offered for sale and in fact accepted an order for sale to Tampa Shipbuilding Co., Tampa Florida, (Davis Tr. p. 37) apparatus manufactured by Plaintiff Rand Development Corporation and thereafter, in lieu of the Rand apparatus, delivered to Tampa Shipbuilding Co. an infringing apparatus manufactured by the Defendants (Davis Tr. p. 40).

## CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action and of all parties hereto (Revised and Supplemental Pre-trial Stipulation-paragraph III 2).

2. Ibis Enterprises, Limited, of Hamilton, Bermuda, is the owner of all right, title and interest in, to, and under the patents in suit Nos. 2,787,314 (Plaintiffs' Exhibit No. 2) and 2,933,125, (Plaintiffs' Exhibit No. 1), and it has the right to recover damages for any and all infringements of said patents, including infringements occurring prior to the date upon which Ibis Enterprises, Limited, acquired such right, title and interest. Plaintiff Rand Development Corporation of Cleveland, Ohio, is the sole and exclusive licensee of Ibis Enterprises, Limited, under said patents. (Revised and Supplemental Pre-trial Stipulation-paragraphs IV–3–6 inclusive, and Ex. 3A–3E).

3. The aforesaid patents in suit numbered 2,787,314 and 2,933,125 are good and valid in law.

4. The Defendants' accused device is admitted to infringe Claims 1, 2, and 5 of the patent in suit No. 2,933,125 (Revised and Supplemental Pre-Trial Stipulation Paragraph III–6) and infringes Claim 11 of patent in suit No. 2,787,314. The Defendants have actively induced infringement by others of each of those claims by the sale of infringing devices to such others with instructions on the use of the infringing devices (35 U.S.C. § 271).

5. The process practiced by the Defendants is admitted to infringe claims 3, 4 and 6 of patent in suit No. 2,933,125 (Revised and Supplemental Pre-Trial Stipulation paragraph III–6), and the Defendants have contributed to the infringement of each of the named claims by others by the sale of apparatus with

instructions for the use thereof in practicing the patented processes (35 U.S.C. § 271).

6. During all times material to this action, the Defendant David H. Richman has controlled and directed the activities of Defendant Spray-Bilt, Inc.; the acts of the corporation are the acts of David H. Richman; and David H. Richman is personally liable for the acts of infringement and unfair competition in trade herein complained of (Tr. pp. 84–86). [Moseley v. United States Appliance Corporation, 155 F.2d 25 (9th Cir., 1946, certiorari denied 329 U.S. 762, 67 S.Ct. 120, 91 L.Ed. 656 (1946), rehearing denied 329 U.S. 826, 67 S.Ct. 182, 91 L.Ed. 701 (1946); Dean Rubber Mfg. Co. v. Killian, 106 F.2d 316 (8th Cir., 1939), certiorari denied 308 U.S. 624, 60 S.Ct. 380, 84 L.Ed. 521 (1940); Southwestern Tool v. Hughes Tool Co., 98 F.2d 42 (10th Cir., 1938); General Electric Co. v. Wabash Appliance Co., 93 F.2d 671 (2 Cir., 1938), certiorari denied 303 U.S. 641, 58 S.Ct. 610, 82 L.Ed. 1101 (1938)].

7. Defendant Spray-Bilt, Inc., and Defendant David H. Richman are both jointly and severally liable to the Plaintiffs for each and every one of the aforesaid acts of infringement of patents No. 2,787,314 and No. 2,933,125 and must account to the Plaintiffs therefor. American Telephone & Telegraph Co. v. Radio Audion Co., 281 F. 200 (D.Del.1922), affirmed 284 F. 1020; Moseley v. United States Appliance Corp., supra; Shuldener v. Trio Water Engineering Corporation, 15 F.Supp. 732 (S.D.N.Y.1936).

8. The Defendants have engaged in acts of unfair competition in trade against the Plaintiffs. The Defendants are jointly and severally liable to the Plaintiffs for such acts and must account to the plaintiffs therefor. (Moseley v. United States Appliance Corp., supra.)

9. The so-called Bradley prior use does not invalidate the patents. It is too late as regards any element of the Bradley device which would make it anticipatory of the patents in suit. Furthermore it has not been established by the degree of proof which satisfies the applicable test. A Defendant must establish such a defense by proof beyond a reasonable doubt, by clear and convincing evidence of the existence of the precise machine or method alleged to be anticipatory and prior to the critical date. The so-called Bradley prior art use was sought to be established on the basis of oral testimony which was inconsistent and contradictory on material points and challenged by impeachment witnesses. This testimony was unsupported by any documents or drawings disclosing the alleged apparatus, or by physical apparatus which was contemporaneous with the alleged date of alleged existence. This evidence falls far short of establishing beyond a reasonable doubt the existence of either a machine or a method alleged to be anticipatory of the inventions of the patents in suit. Washburn & Moen Mfg. Co. v. Beat'Em all Barbed Wire Co., 143 U.S. 275, 12 S.Ct. 443, 36 L.Ed. 154 (1892).

10. The unsuccessful attempts of Utility Trailer Company to develop apparatus and a process to deposit chopped Fiberglass and plastic to form a laminate was nothing more than an abandoned experiment. Such attempts do not anticipate the inventions of Anderson. It was Anderson who first successfully developed apparatus and processes for the simultaneous deposition of chopped glass fibers and plastic and who duly filed applications for patents on these inventions (Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530 (2nd Cir., 1955); Stearns v. Tinker & Razor, 220 F.2d 49 (9th Cir., 1955); Pacific Contact Laboratories v. Solex Laboratories, 209 F.2d 529, 534 (9th Cir., 1954).

11. The fiber glass reinforced corner caps produced by Utility Trailer Company during experimentation to develop apparatus to produce glass reinforced plastic articles were experimental. They were installed for test purposes on a very limited number of truck trailers. Even though the trailers were sold, such sales do not constitute "a public use or sale" of

either the apparatus or the process for producing the apparatus and did not invalidate either of the patents in suit Nos. 2,933,125 and 2,787,314 [Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530, 537 (2nd Cir., 1955)].

12. The long, extensive, and finally unsuccessful experimentation by Utility Trailer in attempting at great expense and with much effort to develop apparatus and a process suitable for the simultaneous deposition of chopped glass roving and plastic, and the ultimate abandonment of the efforts and experiments followed by the adoption of the old method are strong evidence of patentable inventions by the patentee Anderson [Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530, 537 (2nd Cir., 1955)].

13. The claims of the patent in suit No. 2,933,125, and Claim 11 of the patent in suit No. 2,787,314, are not anticipated by the Defendants' alleged prior art patents, prior publications and prior use (35 U.S.C. § 102; Jeoffroy Mfg. v. Graham, 219 F.2d 511 (5th Cir., 1955).

14. The devices disclosed and claimed in the patents in suit No. 2,933,-125 and in Claim 11 of patent in suit No. 2,787,314 are combinations of elements which produced a new and useful result which would not have been obvious to a man skilled in the art; this result constituted a patentable advance in the art [35 U.S.C. § 103; Expanded Metal Co. v. Bradford, 214 U.S. 366, 29 S.Ct. 652, 53 L.Ed. 1034 (1909); Robertson Rock Bit Co. v. Hughes Tool Co., 176 F. 2d 783 (5th Cir., 1938); Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530 (2nd Cir., 1955)].

15. The United States Patent Office has the duty of determining the applicability of Patent Office Rule 131 and also of ascertaining whether or not an interference should have been declared between the Anderson application which issued as patent 2,933,125, when it was in form to issue and any other application pending in the Patent Office or with issued patents and especially the Thompson patent which was cited as a reference against this application. (Manual of Patent Examining Procedure, Third Edition, Page 164, Section 1101, Page 224, and Section 1302.08.) In the absence of clear and convincing evidence to the contrary, it is presumed that a patent is validly issued and that the Patent Office experts charged with the duty of supervising these formal matters have properly and lawfully discharged their duties [35 U.S.C. § 282; Cantrel v. Wallick, 117 U.S. 689, 6 S.Ct. 970, 29 L.Ed. 1017 (1886); Cameron Iron Works Inc., v. Stekoll, 242 F.2d 17 (5th Cir., 1957)]. No such evidence to overcome this presumption has been presented by the Defendants.

16. The six claims in the "main" patent are not anticipated by the disclosure contained in the Thompson patent.

17. The repeated statements and publications by the Defendants extolling the merits and advantages of the inventions of the Anderson patents in suit and the adoption and imitation thereof by the Defendants are proof of what the Defendants think of the patent and are persuasive of what the rest of the world ought to think. [Kurtz v. Belle Hat Lining Co., 280 F. 277 (2nd Cir., 1922)].

18. The apparatus disclosed and claimed in patent No. 2,933,125 was embodied in the commercial devices marketed by Plaintiff Rand Development Corporation, and the methods licensed by Rand to, and used by, its licensees under the patent are described and claimed in said patent; the established commercial success is attributable to the inventions of the patent.

19. The claims and specifications of the patents in suit satisfy the requirements of 35 U.S.C. § 112, and they are sufficiently clear and definite to apprise those skilled in the art of the claims and of how to make and use the apparatus and practice the methods of the patents in suit. [Eibel Process Co. v. Minnesota & Ontario Paper, 261 U.S. 45, 43 S.Ct. 322, 67 L.Ed. 523 (1923); Minerals Separation Ltd. v. Hyde, 242 U.S. 261, 37 S.Ct. 82, 61 L.Ed. 286 (1916)].

21. The Plaintiffs are entitled to an accounting against each of the Defendants to fix damages adequate to compensate for the infringement and contributory infringement by the Defendants of the Plaintiffs' patents in suit Nos. 2,933,125 and 2,787,314, and they are also entitled to an accounting on all unfair competition in trade by each of the Defendants against the Plaintiffs. (35 U.S.C. § 284).

22. The Plaintiffs are entitled to the injunction prayed for as to Claims 1 through 6 of patent No. 2,933,125 and Claim 11 of patent No. 2,787,314.

23. The Plaintiffs are entitled to costs and disbursements.