**SPRAY–BILT, INC. and David H. Richman, Appellants,**

v.

**INGERSOLL–RAND WORLD TRADE, LIMITED, and Rand Development Corporation, Appellees.**

**No. 21057.**

United States Court of Appeals Fifth Circuit.

Aug. 25, 1965.

Rehearing Denied Nov. 9, 1965.

David H. Richman, pro se.

C. Blake Townsend, New York City, Walter Humkey, Miami, Fla., for appellee.

Before TUTTLE, Chief Judge, JONES, Circuit Judge, and GROOMS, District Judge.

TUTTLE, Chief Judge.

This appeal is from judgment for plaintiff-appellee in a patent infringement suit, Ibis Enterprises, Ltd. v. Spray-Bilt, Inc., 220 F.Supp. 65 (S.D. Fla.1963). We can best state the essential facts of the case by quoting certain of the trial court's findings of fact as follows:

1. *Parties*

Plaintiff Ibis Enterprises, Limited, is a corporation of Bermuda. Plaintiff Rand Development Corporation is a corporation of Ohio and has a principal place of business at Cleveland, Ohio. Defendant Spray-Bilt, Inc., is a corporation of Florida and has a principal place of business at Hialeah, Florida. Defendant David H. Richman is an individual residing in Miami, Florida, Plaintiff Ibis Enterprises, Limited, is the owner of the two patents in suit. Plaintiff Rand Development Corporation is the exclusive licensee of Ibis Enterprises, Limited, under the patents in suit and shares the profits derived from said patents with Canadian Ingersoll Rand Company, a subsidiary of Ingersoll Rand Company.

2. *Civil Action*

This is a civil action for infringement of United States Patent No. 2,933,125 filed on August 6, 1953 and granted on April 19, 1960 and United States Patent No. 2,787,314 filed on October 13, 1954 and issued April 2, 1957, and for unfair competition in trade. Patent No. 2,933,-125 is the main or basic patent and relates to methods and apparatus for the simultaneous deposition of fiber reinforced plastics; Patent No. 2,787,314 relates to improvement on the methods and apparatus of the main patent. This action was commenced on April 4, 1961.

3. *Background of Patentee*

David F. Anderson, the patentee of the patents in suit, is a man of attainments and undenied qualifications. He is a British educated graduate engineer, and he served as a group captain in the Royal Air Force during World War II and did experimental and test work because of his engineering background (Anderson Tr. pp. 9–12). Following his retirement from the Air Force, Anderson formed Fiberlast of Canada, a Canadian Corporation (Anderson Tr. pp. 9–12, 51–52) which acquired exclusive rights under the "Vidal" process for forming glass reinforced plastic articles. Anderson became familiar with the several other commercial processes then in use for forming such articles, each of which processes may be grouped in one of two types: "hand lay-up" and "matched die (or metal) mold" (Anderson Tr. 208–220; Tr. 163–166).

4. *Prior Art Hand Lay-Up Method*

The "Vidal" process involved, in part, the "hand lay-up" process of laboriously hand tailoring and fitting of fiberglass cloth or mat (Exhibit 8) on a mold, hand mixing small batches of a catalyst, promoter and liquid resin mixture which

was poured on the tailored cloth. It was necessary to mix these components in small batches from time to time, as the liquid resin solidified within a short time once the setting components of catalyst and accelerator were added. In the "Vidal" process the resin and cloth were covered with a cellophane sheet, and pressure was then applied thereto to distribute the resin (Anderson Tr. p. 52). In the hand lay-up process the plastic was distributed and air bubbles were removed by hand brushing or rolling (Tr. pp. 87, 164, 165; Anderson Tr. pp. 214, 215).

5. *Prior Art Matched Metal Mold Method*

(a) Another process then in use for forming glass reinforced plastic articles was the so-called "matched metal mold" or "matched die" process. This process involved the use of male mold and a complementary female mold. A preform, which comprised chopped strands of fiberglass held loosely in position by a binder of starch or resin and had a general conformation of the molds (Trial Exhibit 17.1), was then placed on one of the molds; resin, catalyst and promoter were than mixed and poured onto the preform; and finally, the other mold was pressed onto the first mold, squeezing the preform and thereby distributing the resin and forming the resultant plastic article (Tr. pp. 73, 114; Rand Tr. pp. 175, 176).

(b) The fabrication of a preform used in this process is a separate process in which glass roving, a rope-like material made up of several stands of glass loosely held together (Patent No. 2,933,125, Column 1, lines 21–29), is cut and blown onto a screen having the general conformation of one of the matched metal molds. A vacuum within the screen draws the glass fibers onto the screen. After or during deposit of the fibers on the screen, the fibers are lightly coated with either a powdered or liquid resin or starch merely to hold the fibers together to permit gentle handling of the preform. (Tr. pp. 112–114).

6. *Anderson Early Work and Invention*

(a) Anderson was dissatisfied with the hand lay-up process because of the hand mixing of resins and setting components, the mess created by pouring and spreading the liquid plastic, and the tedious and time-consuming work required to tailor and drape the fiberglass mats to fit compound curves on the mold (Anderson Tr. pp. 54–56). He was further satisfied that he could devise a way to eliminate the expense of pre-form preparation and the high costs and the limited scope of application associated with the molding step required in the "matched metal mold" process (Anderson Tr. p. 59).

\* \* \*

7. *Patent in Suit No. 2,933,125*

(a) The apparatus (claims numbered 1, 3 and 6) of the patents in suit is described by the following passages from the specification of patent No. 2,933,125:

> "the depositor is shown as comprising a self-feeding cutter 10 mounted on and driven by a motor 11. Fiber rope, or roving, is guided by a feed pipe 12 into one side of the cutter 10 wherein the roving is cut into the desired lengths and ejected from the opposite side of the cutter 10. Mounted on the opposite ends of the cutter frame 13 are spray guns 14 arranged to direct a spray of atomized plastic on the fiber cuttings ejected from the cutter 10. The sizes and weights of the cutter 10, motor 11 and spray guns 14 are such that the depositor may be hand-held and readily manipulated by the operator to direct a continuous stream of plastic impregnated fiber against a form or mold to build up a lamina of the reinforced plastic article being fabricated." (Column 2, lines 39–52).

The form of cutter described in the patent comprises a pair of cylindrical rollers parallel to and in frictional contact with each other. One of the rollers is driven by the motor and in turn drives the other roller by the frictional contact between them. One cutter roller has a cutting element like a razor blade imbedded in

circumferential spaced relation so as to cut roving passing in between the rollers (Patent 2,933,125, Column 2, lines 39–72, column 3, lines 1–19).

(b) The methods (claims numbered 2, 4 and 5) of patent No. 2,933,125 are described by the following passages from its specifications:

"The present invention includes the method of, and a hand-held device for cutting roving into desired lengths, ejecting the cut fiber into a spray of resin and then depositing the impregnated roving on a mold. By cutting the fiber, impregnating it and applying it all in one operation, the operator may readily deposit directly on to the mold only the appropriate quantities of fiber and activiated resin thereby reducing to a minimum wastage of resin, fillers and pigment. Moreover, with this invention the resin and its setting components are mixed only at the point of actual use and hence only as needed." (Column 1, lines 55–65).

When polyester resin is activated by being mixed with an accelerator and a catalyst, there is a change from a liquid to a solid within a few minutes. In the practice of the process of the patents in suit, the setting components of the accelerator and promoter are contained in separate sprays. The setting components of the liquid plastic are thus mixed only upon the meeting and commingling of the sprays of liquid plastic (Patent 2,933,125, Column 4, lines 19–27; Claim 6). * * *

11. *Defendants were Licensees Under Patents in Suit*

(a) During 1958, Defendant David H. Richman was employed as sales manager with Fabulous Fiberglass, Inc., a licensee of the Plaintiff Rand Development Corporation under the patents and pending applications for patents on the Anderson process and apparatus (Richman Tr. pp. 25–35).

(b) Thereafter in 1959 the Defendants David H. Richman and Spray-Bilt, Inc., became sales agents of Plaintiff Rand Development Corporation (Plaintiff's Ex. No. 28; Tr. p. 295; Richman Tr. p. 210). Each of the Defendants, while acting as such agents, advertised and lauded to the public their contractual relationship with Rand and the patents on the Rand produced apparatus and the Anderson patented method, and they subsequently terminated their contractual relationship with the Plaintiff Rand but continued for several months thereafter to distribute to the public advertising material showing Rand apparatus; some of this material contained the legend "Patented Process" while making, using and selling admittedly infringing apparatus manufactured by and for the Defendants without license of Rand (Davis Tr. pp. 44–57; Plaintiffs' Miami Deposition Exhibits Nos. 20, 22, 23, 25, 27, 49, 70, 71, 73, 74a, E, F, 76). * * *

17. * * *

(a) Claim 11 only of patent No. 2,787,314 in suit is involved in this suit. The Defendants have denied infringement. Claim 11 defines a feeding mechanism for the cutter described in Finding numbered 7(a), supra, and comprises a guide plate and a pair of parallel rollers positioned on the inlet side of the cutter. This mechanism receives a free end of roving fed through a hole in the guide plate and directs the roving into the rollers of the cutter. The purposes of this mechanism are to permit easy feeding of the roving into the cutter, to eliminate any danger of injury to the operator which is present whenever roving is fed directly into the cutter, and to prevent roving from falling free of the cutter when the operation of the cutter is interrupted (Tr. pp. 158, 159; Patent 2,787,314, Column 4, lines 18–48).

(b) In the Defendant's device, there is a single feed roller positioned on the inlet side of the cutter and parallel to one side of the cutter rollers. Roving is fed through holes in a guide plate and in between these rollers and then into the cutter. This feed mechanism is of substantially the same construction and serves the identical purposes as feed

mechanism of the patent in suit (Tr. p. 161).

18. *Defendants Palm Off Their Apparatus as Plaintiffs'*

Each of the Defendants offered for sale and in fact accepted an order for sale to Tampa Shipbuilding Co., Tampa, Florida (Davis Tr. p. 37) apparatus manufactured by Plaintiff Rand Development Corporation and thereafter, in lieu of the Rand apparatus, delivered to Tampa Shipbuilding Co. an infringing apparatus manufactured by the Defendants (Davis Tr. p. 40).

■ At this point several things should be noted: First, finding 6(b) has been omitted. It is, in substance, a legal determination and, thus, is reviewable free of the "clearly erroneous" limitation.

Second, without questioning the correctness of the remaining findings actually made by the district court [to the extent that they constitute strictly findings of "primary," as opposed to "ultimate" fact, see Galena Oaks Corp. v. Scofield, 218 F.2d 217 (5 Cir. 1954)], we conclude that they are insufficient in law to sustain the verdict below. There remains a further ground of invalidity not eliminated by the findings below, and since the factual basis for this decision lies undisputed in the record itself, it is unnecessary to remand for further findings. See Barron and Holtzoff, Federal Practice and Procedure § 1138, pp. 570–571 (Wright Ed. 1961).

■ Third, we are cognizant of the fact that these same patents were recently contested in the Ninth Circuit and found invalid. Canadian Ingersoll-Rand Co. v. Peterson Prods. of San Mateo, Inc., 9 Cir. 350 F.2d 18 (June 29, 1965), affirming 223 F.Supp. 803 (N.D.Calif. 1963). While we realize that this decree of noninfringement cannot deprive plaintiff of the right to an independent judgment against *this* defendant on *this* record, we find the decision of the Court of Appeals for the Ninth Circuit, rendered on substantially identical facts, strongly persuasive. See Williams v. Hughes Tool Co., 186 F.2d 278, 281 (10 Cir. 1950). It is true that some of the grounds on which the Ninth Circuit sustained the California District Court's holding of invalidity of the patent are not open to us in light of fact findings by the lower court in this case which we cannot set aside as clearly erroneous. This does not weaken the reasoning of that Court's opinion dealing with the ground on which we base our decision.

Fourth, although there may be subtle theoretical distinctions between newness, 35 U.S.C.A. § 101[1] and non-obvious subject matter, 35 U.S.C.A. § 103[2] as statutory conditions of patentability, we see no practical reason for treating them as separate questions in this context of combination patents.[3]

1. Whoever invents or discovers any new and useful process, machine, manufacture, or composition of matter, or any new and useful improvement thereof, may obtain a patent therefor, subject to the conditions and requirements of this title. July 19, 1952, c. 950, § 1, 66 Stat. 797.

2. A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102 of this title, if the differences between the subject matter sought to be patented and the prior art are such that the subject matter as a whole would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains. Patentability shall not be negatived by the manner in which the invention was made. July 19, 1952, c. 950, § 1, 66 Stat. 798.

3. In this view of the case it becomes unnecessary to reach the specific issue of anticipation, treated at length by the district court. Although it has been said that "anticipation is strictly a technical defense" and that "unless all of the same elements are found in exactly the same situation and united in the same way to perform the identical function in prior pleaded patent, there is no anticipation," 1 Walker on Patents § 57 at 243 (Deller Ed. 1964), it is nevertheless clear that claims in an application may be rejected on a combination of several patents taking specific features from each, *ibid.* "This seeming contradiction is to be explained by the fact that for a claim to

■ Directing our attention, then, to the validity of the main Anderson patent (hereinafter referred to as Anderson '125) allegedly infringed, we are immediately faced with the "rather severe test" promulgated by the Supreme Court to test patents made up of new combinations of old elements, Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 152, 71 S.Ct. 127, 130, 95 L.Ed. 162 (1950), i. e., are there "any unusual or surprising consequences from the unification of the elements here concerned?" Granted, this test is not an end-all by any means, but it does indicate an approach for determining the validity of combination patents and amounts to a mandate from the Supreme Court to "scrutinize combination patent claims with a care proportioned to the difficulty and improbability of finding invention in an assembly of old elements." Ibid.

In light of this mandate, we must ascertain (1) the status of the prior art at the time of Anderson's claimed invention, (2) what Anderson did to improve upon prior art, and (3) whether what Anderson did is properly to be classified as invention. To achieve meaningful results, greater reliance should be placed upon the history of the art; it is only through such an approach that substance may be injected into the vague, general and often specious tests which abound in this area.

■ As the district court noted, there appear in the record below numerous examples of conflicts in testimony, self-serving statements and credibility problems in general—problems which, of course, must be properly resolved by the lower court, subject to the "clearly erroneous" limitation. The evidence upon which we now rely in reversing, however, stands undisputed in the record.

It is clear from the trial record that the concept of spraying two chemical liquid reactants, one of which carries a coagulant, for external and mixing reaction is *per se* old in the art. *E. g.*, Hanson No. 2,335,116 (Tr. p. 189) ;[4] Hanson No. 1,165,099 (Tr. p. 190); Thompson No. 2,265,209 (Tr. p. 190); Semtex (British) No. 566,543 (Tr. p. 190). Anderson does not purport to be the inventor of the spray guns used in developing the simultaneous depositor (Anderson deposition at 103); nor did he claim to have invented the twin spray technique (Anderson deposition at 155). There appears to be only one substantial reason why the spray guns in the prior art were not suitable to Anderson's purposes: Anderson could see no way to introduce the chopped fibers between the converging sprays of the Schori gun, as it was then designed (Anderson deposition at 108; Anderson deposition Exhibit 36). It is clear from the record that the problems involved in spraying resin rather than paint had already been explored and apparently solved before the fruition of Anderson's efforts in this area (Anderson deposition Exhibit 36, Feb. 21, 1951).

Pursuing further this inquiry into the status of the prior art, we turn from the spraying of liquids alone to the method of simultaneously ejecting and spraying various body materials with liquid binders or adhesives. There appear undisputed in the record several prior art references which fit into this general category, e. g., Lampe No. 2,433,463 (Anderson deposition at 172 et seq.); (process of coating asbestos or cork particles in flight with suitable adhesive); Brennan No. 2,408,038 (Tr. p. 185) (spraying of fiber or plaster, coating it with a spray of binder, including resin, to make a finished product (Tr. 220–21); McDonald Nos. 2,313,082 and 2,330,300 (Tr. p. 185) (relating to spraying of cork

---

be patentable, it must not only be not anticipated but must also involve invention or be non-obvious." *Ibid.* It is this latter route to a holding of invalidity which is followed in the instant case—a route which is not comprised of the element of strict anticipation.

4. Although we do not ordinarily include references to the trial record in opinions written for this Court, we think it appropriate to do so here because we deal with a theory of the case as to which the trial court's opinion was not fully documented.

with a spray of latex). Moreover, in the specific category of simultaneous deposition of fiberglass with resin binder is Thompson No. 2,850,421 (Tr. 187, 255–58), which utilizes a circular disk cutter to cut roving into short lengths, separating the fibers of the cut roving, projecting them into a jet of uncured plastic resin and, finally, depositing the coated fibers on a mold or surface. Although the Thompson patent was overcome *as an anticipation* by the filing of Anderson's affidavit under Patent Office Rule 131, it remains as evidence relevant to the issue of "obviousness" and "newness" of the Anderson combination. Also within the reinforced plastic field is the prior art involved in the previous two-step method of making fiberglass reinforced plastic, illustrated by Essman No. 2,653,335 (Tr. 187) and Bacon No. 2,702,261 (Tr. 187). These latter two processes—both relating to the making of pre-form—combine a cutter element (to be discussed herein) with a resin impregnator element. Glass strands are fed into a separate cutter, and the cut fibers are then dropped on to a pre-form screen (shaped in the form of the desired finished product), described more fully in finding of fact 5(b), supra. In this process the fibers are coated with a binder so that the pre-form can be more easily handled and carried to the matched die molding stage (Tr. 194–96).

The final component of the relevant prior art which must be examined is the rotary cutter or chopper designed to sever fiberglass strands into shorter fiberglass lengths. The use of such cutters was old *per se* in the art, *e. g.*, Bacon and Essman, supra; Slayter No. 2,618,-817 (Tr. 183, 281) (relating to the cutting of fiberglass insulation). The cutters utilized in the Bacon and Essman processes were apparently based upon the principle of the Brenner and Turner cutters (Anderson deposition at 113–114, 241; Tr. 194), both of which admittedly preceded Anderson's activity in the field by several years (Anderson deposition at

143). Anderson acknowledged his familiarity with the operation of both cutters prior to 1952 (Anderson deposition at 113–119), and furthermore, he admitted that they were the same in principle as his cutter, "in that the roving was cut by a blade which was protruding from a roller, and cut the roving against a resilient roller, in this case rubber." (Anderson deposition at 117).

A discussion of the prior art and use would be incomplete without reference to the activities of Utility Trailer Co., a detailed description of which can be found in the district court's findings of fact, 220 F.Supp. at 71–72. Assuming, without deciding, that the record supports the district court's quasi legal conclusion that Utility had "abandoned" its efforts in the area of reinforced plastics, Utility's endeavors in this field prior to the perfection of Anderson's apparatus are pertinent to the issue of obviousness and lack of invention in Anderson. The only apparent difference between the Utility device and that of Anderson is the lack of physical conjunction between the cutter and the spray gun in the former.

Although certainly not exhaustive, the above describes, in substance, the status of the art prior to the culmination of Anderson's efforts in 1952. The next step in our analysis is to determine exactly what Anderson did to improve upon prior art, since the fact of *some* improvement cannot be denied. Anderson seems to have been the first to mount a chopper between two nozzles emitting converging sprays of liquid.[5] This elimination of separate cut down on glass waste. Moreover, the portability of this device apparently resulted in more flexibility, allowing wider areas of application, *e. g.*, overhead fabrication or coating. Finally, this innovation would seem to effect a more thorough wetting of all fibers, with a resulting attainment of more uniform strength of the laminate.

The California district court correctly described the substance of Anderson's

---

5. Since it is unclear from the record whether Thompson's chopper (Thompson No. 2,850,421) is mounted in this manner, we shall give Anderson the benefit of this doubt.

case for improvement over the prior art as being "limited to the single point of the simultaneous, as distinguished from the previous two step, depositing of fiberglass roving with resin binder to form a reinforced plastic article." Canadian Ingersoll-Rand Co. v. Peterson Prods. of San Mateo, Inc., 223 F.Supp. 803, 809 (N.D.Calif.1963).

Having thus analyzed the status of the prior art and the extent of Anderson's improvements thereupon, we must determine whether what Anderson did is properly classified as invention—subjecting Anderson '125 to the "rather severe test" outlined by the Supreme Court in the Great Atlantic & Pacific Tea Co. case, supra. In our opinion, the district court focused its attention so heavily upon distinguishing in detail each individual apparatus from the Anderson '125 that it failed to appreciate the cumulative effect of the relevant prior art as it bears upon the issue of "obviousness" of the Anderson combination.

While it is true that Anderson was the first to mount the chopper between converging sprays of liquid resin, he admitted that this use of the cutter in his apparatus "occurred to me the moment I saw the roving." (Anderson deposition at 68–69). Prior to the availability of strands of fiberglass roving experimentally in 1950 or '51, (Anderson deposition at 69–70), there were several references to the simultaneous deposition of already-cut body materials and liquid adhesives, e. g., Lampe, supra; Brennan, supra; McDonald, supra; Thompson, supra; Bacon, supra; Essman, supra. In addition, Anderson himself, dissatisfied with the fiberglass mats which he had been using as body material or molding, decided in 1951 to substitute, as a reinforcement, already chopped fibers which he planned to blow through a hose onto a form between two sprays of resin. However, before he had proceeded very far with this idea, he received his first samples of fiberglass strand roving and therefore turned his attention to cutting roving directly onto the mold and developing a cutter which

could be placed between the two nozzles (Anderson deposition at 55–58, 63–64). Furthermore, Anderson admitted, that if a cutter were added to the Lampe process, supra, and the nozzles modified suitably, one would end up with a device similar to Anderson '125 (Anderson deposition at 174). Regarding the cutter itself, although the Bacon and Essman prior art, supra, which utilized the Brenner and Turner type cutters, supra, were apparently not portable and thus not flexible enough for Anderson's operation (Anderson deposition at 118–119), the Slayter device, supra, did embody this portability feature (Anderson deposition at 171–172). While Slayter allegedly was not a suitable cutter for Anderson's purposes (Anderson deposition at 170–171), since the blades could not converge simultaneously, both the Bacon and Essman cutters were apparently adequate in this respect (Anderson deposition at 114–122).

■ From this assemblage of the prior art, we conclude that the Anderson '125 combination patent as a whole is lacking in "any unusual or surprising consequences from the unification of the elements here concerned." Great Atlantic & Pacific Tea Co., supra, 340 U.S. at 152, 71 S.Ct. at 130. While we realize that the materials used in, and the end purposes of, the above references do not identically correspond to their counterparts in the field of reinforced plastics (but see Thompson, supra), we nevertheless conclude that they comprise the relevant prior art contemplated by 35 U.S. C.A. § 103, set out in full at note 2 supra. To place an imaginary barrier around the reinforced plastics field, and to limit the prior art which may be considered in determining "obviousness" under 35 U.S. C.A. § 103 accordingly, would not correspond to reality. Surely the mind of a person having ordinary skill in the field of reinforced plastics in 1951 was not so artificially circumscribed. Moreover, a ruling to the contrary would provide a stimulus to attempted patents upon mounted cutter-spray gun combinations in these analogous areas of simultaneous

deposition. Such a result would be antithetical to the higher end which the Constitutional grant of monopolistic patent privilege was designed to serve—the advancement of science. Great Atlantic & Pacific Tea Co., supra, 340 U.S. at 154– 154, 155, 71 S.Ct. 127 (Douglas, concurring).

To summarize, the Anderson '125 combines (1) the prior art process of simultaneously depositing pre-cut body material and binder, (2) the prior art roller-cutter device and (3) the prior art feature of portability. Nor do these old component elements "perform any additional or different function in the combination than they perform out of it. * * * Two and two have been added together, and still they make only four." Great Atlantic & Pacific Tea Co., supra, 340 U.S. at 152, 71 S.Ct. at 130. We agree with the conclusion of the district court in Canadian Ingersoll-Rand Co. v. Peterson Prods. of San Mateo, 223 F. Supp. 803, 814 (N.D.Calif.1963), that

> "patentable invention certainly cannot be held to consist in merely making a bracket to mount a cutter on a spray gun—a mechanical step that would be obvious to any mechanically skilled person who wanted to accomplish the simultaneous operation in that manner rather than by holding the chopper and the spray gun separately."

Our conclusions are influenced by the relative youth of the fiberglass industry and especially by the fact that fiberglass roving in strands did not become available for experiment until approximately 1950. The efforts of Utility (abandoned or not) and Anderson, following so closely upon the availability of roving strands are indicative of the obviousness of the Anderson '125 combination. Any other result would allow a person with ordinary skill in an art to sweep under the monopolistic protection of a patent the mechanical adaptation of new materials to the existing art.

Implicit in our holding is a finding that any presumption of validity attached to the issuance of this patent has been overcome by clear and convincing evidence to the contrary, evidence which lies undisputed in the record of this case.

Turning now to the question of the validity of claim 11, the Anderson improvement patent No. 2,787,314 (hereinafter referred to as Anderson '314), described in detail in the district court's findings of fact, supra, we feel that its invalidity follows a fortiori from what has been said above. Having concluded that the Anderson '125 patent is invalid and that its disclosure thus lies in the public domain, we must leave room for mechanical improvements thereto which increase its efficiency, economy of operation and usefulness; otherwise, we make an empty promise. The method and apparatus claimed by claim 11 of Anderson '314 "would have been obvious at the time the invention was made to a person having ordinary skill in the art * * *" (35 U.S.C.A. § 103) upon perceiving that the strand roving fell to the ground when the operator stopped the machine. "[I]t is not invention to produce a device which is within the realm of performance of a skilled mechanic in the ordinary progress of producing a device to effectuate a given result." Application of Demarche, 219 F.2d 952, 955, 42 CCPA 793 (Court of Customs and Patent Appeals, 1955). Again, our conclusions in this regard are influenced by the fact that so little time elapsed between the introduction of roving in strands and the application for Anderson's main patent. Compare Forestek Plating & Mfg. Co. v. Knapp-Monarch Co., 106 F. 2d 554, 557 (6 Cir. 1939) (validity of improvement patent upheld in light of prior, repeated unsuccessful efforts).

The district court's findings of fact with regard to plaintiff's unfair competition count (Finding Nos. 11 and 18) lie undisputed in the record. However, the appellees have neither submitted legal authority on this issue nor demonstrated damage actually suffered as a consequence of defendant's "unfair" activities. Indeed, the appellees themselves admitted that the event giving rise to Finding No. 18 was "a minor thing"

(Tr. 39). As for Finding No. 11, we agree with appellant that his imitation of appellees' advertising layouts, without any apparent deception as to the identity of source, is privileged (in light of the invalidity of the Anderson patents) on the theory that the right to compete includes the right to imitate.

 Nevertheless, despite the "de minimus" nature of the unfair competition claim based on Finding No. 18, we conclude that plaintiff is entitled to an accounting by defendant for profits made on the sale to Tampa Shipbuilding Co. Thus, we remand for this limited purpose only. In all other respects, the judgment of the district court is reversed and the case is remanded with instructions to vacate the injunction of further infringement and to enter such further orders as may be necessary to conform to the decision of this Court.