CANADIAN INGERSOLL–RAND COMPANY, Ltd., Rand Development Corporation and Ibis Enterprises, Limited, Plaintiffs,

v.

PETERSON PRODUCTS OF SAN MATEO, INC., a corporation, also known as Peterson Spray Gun Co., Inc., a corporation, Defendant.

Civ. No. 38070.

United States District Court
N. D. California, S. D.

Aug. 13, 1963.

Byerly, Townsend, Watson & Churchill, New York City, and Bronson, Bronson & McKinnon, San Francisco, Cal., for plaintiffs.

Townsend & Townsend, San Francisco, Cal., for defendant.

SWEIGERT, District Judge.

Plaintiffs, Canadian Ingersoll Rand Company, Ltd., and Ibis Enterprises, Ltd., are the owners, and plaintiff, Rand Development Corporation, is the exclusive licensee of certain patents upon a device and method for making fiberglass reinforced plastic articles—Patent No. 2933125, applied for by David F. Anderson on August 6, 1953 and issued to applicant on April 19, 1960, herein referred to as the main patent, and Patent No. 2787314, (Ex. 2) applied for by Anderson on October 13, 1954 and issued April 2, 1957, herein referred to as the improvement patent.

The plaintiffs charge defendant, Peterson Products of San Mateo, Inc., with infringement of all six claims of Anderson '125—claims 1, 2 and 5 being apparatus claims, of which claim 2 is representative, and claims 3, 4 and 6 being method claims of which claim 4 is representative. Only claim 11 of Anderson '314 is involved.

The defendant denies infringement and by way of further defense challenges the validity of both patents. The case has been tried to the Court without a jury.

ANDERSON NO. 2,933,125

The Anderson main patent '125 discloses, teaches and claims a method and an apparatus for performing it, of making reinforced plastic articles, comprising the steps of simultaneously cutting and ejecting fiber roving into relatively short lengths and forming converging sprays of a mixture of resin and catalyst and a mixture of resin and accelerator, then causing the cut fibers to move into the converging sprays and carrying the fibers on the spray onto a form to build a lamina of the article.

The art of making reinforced plastic articles was born in about 1946–1947 with the use of liquid but quick hardening resins, reinforced with fiberglass, to form plastic structural articles and parts—at first mainly small boats.

Resins were commercially available from which could be prepared resin-catalyst mixtures and resin-accelerator (promoter) mixtures which, when combined, quickly hardened into a hard plastic structural material.

The fiberglass reinforcing element was at first commercially available in the form of woven roving cloth or matting made of chopped fiberglass or in the form of the loose chopped fiberglass itself.

Manufacture of plastic articles or parts was accomplished by either of two methods—the hand lay up method or the preform (matched metal die) method.

The hand lay up method consisted in hand tailoring fiberglass matting, fitting it to lay on or around a mold and then brushing or spraying it with the bonding resin so that the fiberglass reinforced resins would harden to form a structural

article or part, which could then be removed from the mold.

The preform (matched metal die) method consisted in the use of special equipment to chop or cut fiberglass rope into small lengths, impregnate it with a bonding resin sufficiently to form a temporary, loose form of the general intended shape, then putting the form into matched metal dies with heat and pressure on both sides to harden and form the final plastic structural particle or part.

The special equipment used in this preform method to prepare the temporary, loose plastic form was a Brenner type cutter (based on Bacon Patent No. 2,-702,261 to which further reference will be made) which was a relatively large bench type device which cut or severed the fiberglass rope into shorter lengths, blew it through a conveyor to a point at which a powdered polyester binder resin was added, then in random fashion against a perforated mold (through which a vacuum was drawn) thus simultaneously cutting the fibers and impregnating them with a suitable resin adhesive to bind the fibers loosely together on the mold.

Spray gun equipment, e. g., the Schori type spray gun (to be hereinafter further discussed) was also already commercially available and suitable for spraying from twin headed spray guns two reactant and adhesive components, e. g., resin catalyst and resin accelerator (promoter) adapted to converge externally of the equipment itself just prior to deposit on a surface. Such spray equipment eliminated the inconvenience and wastage involved in premixing reactant liquids which, when combined, began to harden—"short pot life" mixtures.

In both the hand lay up and preform methods two steps were necessary—(1) separately preparing the general shape of the fiberglass reinforcement by hand tailoring the fiberglass mat on a mold in the hand lay up method or by preforming it into a temporary loose form by special equipment in the preform (matched metal die) method and—(2) brushing or spraying resin catalyst and resin accelerator (promoter) on the fiberglass reinforcement form.

Anderson was quite familiar with this prior art and prior use. His patent recites them and points out that there were disadvantages associated with them—as, for example, the considerable labor in hand tailoring fiberglass matting to a mold, especially where the mold involved curvatures, the extreme difficulty of impregnating mat with resin without entrapping air bubbles and the considerably greater cost of matted fiberglass over fiberglass roving. Concerning the preform method, his patent recites the difficulty of metering out and depositing the loose, chopped fibers uniformly in the desired quantities on the mold or forms and the greater bulkiness of loose chopped fibers, pound for pound, over roving.

The Anderson patent then recites: That his invention includes the method of, and a hand held device for, cutting roving into desired lengths, ejecting the cut fibers into a spray of resin and then depositing the impregnated roving on a mold; that by cutting the fiber, impregnating it and applying it all in one operation the operator may readily deposit directly to the mold only the appropriate quantities of fiber and activated resin thereby reducing to a minimum wastage of resin, fibers and pigment; that, moreover, with this invention the resin and its setting components are mixed only at the point of actual use and hence only as needed, the advantage associated with this feature of applicants' invention being that, inasmuch as once the resin is activated or mixed with its setting component, it is necessary to use the resin within a short time and that his invention eliminates the disadvantages associated with mixing a predetermined quantity of resin and setting component to be used for a given job, a procedure which often leads to a considerable wastage of resin.

In the pending case defendant challenges the validity of the Anderson patent upon the ground that it was anticipated both by prior art and prior use and,

therefore, lacks novelty, and also upon the further ground that it constitutes merely an obvious combination of well known elements without any new or unexpected result and, therefore, lacks invention.

### PRIOR ART—THE SPRAY GUN— THE CUTTER

As already indicated, the concept of spraying two chemical reactants for external and mixing reaction is per se old in the art. Hansen No. 2,249,205 (Ex. 102); Hansen No. 2,165,099 (Ex. 103); Mantle No. 2,606,072 (Ex. 105); Semtex (British) No. 566543 (Ex. 106), each discloses the concept of spraying from twin headed spray guns two reactant adhesive components adapted to converge externally of the equipment itself to provide a longer pot life for the reactant materials.

Anderson has admitted that his patent description of the spraying of catalyzed and promoted resins was the same system described in the Schori spray gun brochure (Plfts. LA Ex. II.3) and, further, he disclaimed being the inventor of this two component resin system (Tr. Vol. 20, 2978).

Anderson had gone to the Schori Process Co., in 1951 and had examined the Schori twin headed spray (LA Ex. 10) and admitted that the Schori brochure, describing a two component catalyst and accelerator spray system, was the same as his spray gun. He did not use the Schori gun itself, only because he saw no way of mechanically mounting his cutter between the spray heads of the Schori gun.

Plaintiff has stated for the record in this trial that it does not claim the dual spray of resin catalyst and resin accelerator to mix in converging in the air as an Anderson invention.

Although Anderson in his deposition disclaimed being the inventor of the dual spray technique, he argues before the patent office that the spraying of catalyst resin and accelerator resin was the point that distinguished applicant's invention from the prior art. Further, as already above set forth, his own patent recites this as a feature of his invention.

The concept of using a rotary cutter or chopper to sever fiberglass strands into shorter fiber lengths was also old per se in the art. Bacon No. 2,702,261 (Ex. 112); Stotler No. 2,719,336 (Ex. 114); Slayter No. 2,618,817 (Ex. 107).

Anderson has admitted having prior knowledge of the Brenner and Turner cutters used in the fiberglass plastic prior art. These cutters were based upon the above Stotler and Bacon patents, supra, and comprised a blade holding roller cooperable with a rubber backup roller, operating on the same principle as the cutter element of the Anderson patent (Tr. 3006–3008). These bench type cutters, however, were too large to be conveniently hand portable although, it will be noted, that Slayter supra, shows a small hand held fiberglass cutter device.

Anderson has admitted that the concept of using a smaller hand held cutter occurred to him the moment he saw a sample of fiberglass roving, which he tried cutting with a pen knife, and that it was obvious it would be very easily cut and no great power would be required. (Tr. 3009).

The significance of this admission lies in the fact that this essential material, i. e., fiberglass in the form of roving, was not a reality in 1946 and became available only experimentally in 1951. Anderson had to wait to get fiberglass in the form of roving and, when he saw it, he got the idea of making a small hand held cutter to cut it—a cutter, however, based upon the principle of the Brenner and Turner cutters (Bacon and Stotler patents, supra) which he said were the same in principle in that roving was but by a blade protruding from a roller and cut the roving against a resilient rubber roller.

That there is no invention in merely making a smaller, more compact version of well known devices is the point of Frigidaire Corp. v. General Necessities Corp., 46 F.2d 58, 59 (6th Cir. 1931), the household refrigerator case, especially when the smaller version becomes prac-

tical because of new availability of an element for which the inventor of the device can claim no credit, e. g., household electricity in the Frigidaire case and fiberglass in the form of easily cut roving in the present case.

Plaintiff has stated for the record in this trial that it does not claim the cutting technique, itself, that it claims only the combination of two techniques—the admittedly old dual component spray gun with the admittedly old fiberglass roving cutter and that the issue is whether there is novelty or invention in this combination.

## ANDERSON '125—A COMBINATION PATENT

■ Ordinarily when patent claims are drawn to a mere congregation of two or more well known elements the combination is unpatentable unless the combination of such elements or steps produces in some way or manner a surprising or unusual result which would not have been expected by a person having ordinary skill in the art. Great Atlantic & Pacific Tea Co. v. Supermarket Equipment Corp., 340 U.S. 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950); Oriental Foods, Inc. v. Chun King Sales, Inc., 244 F.2d 909 (9th Cir. 1957); Kwikset Locks, Inc. v. Hillgren, 210 F.2d 843 (9th Cir. 1954); Hunter Douglas Corp. v. Lando Products, Inc., 215 F.2d 372, 374 (9th Cir. 1954).

In the pending case the spray gun element of the Anderson patent and the cutter element each performs its normal, expected and obvious function when operated together as they do when operated separately. (Tr. 3056). In fact, defendant's device, which plaintiff accuses as an infringement of Anderson, is so constructed that the spray element and the cutter element are demountable to make them usable either together or separately for their respective purposes.

Nor is there any contention that the Anderson combination of these two known elements used with the same ingredient materials as in previous methods produces an end result substantially different than was produced by the same elements used separately in the previous methods. In either case the end result is a fiberglass reinforced plastic article.

Plaintiff, therefore, rests its case for invention upon the theory that the Anderson patent discloses and teaches a new method (and a new apparatus for performing it) of making fiberglass reinforced plastics.

This new method and apparatus, according to plaintiff, consists of doing automatically at one time, using the same ingredients formerly used in and applied in the hand lay up method or the preform (matched metal dies) method, what was previously done in what we have already described as two separate steps.

Plaintiff further concedes, and the evidence shows, that the Anderson combination method and apparatus does not eliminate all of the equipment or steps previously involved in the hand lay up and preform (matched metal die) methods of producing fiberglass reinforced articles. Certain basic equipment remains as much involved in the use of the Anderson spray up method and apparatus as was involved in these previous methods, e. g., at least two available resin tanks to store and supply the two resin components, an available air compressor, the fiberglass roving supply, hoses to feed the roving and the resins to the device, booms and cables of some kind for practical support of the device in use, a mold of some kind, etc.

Plaintiff further concedes, and the evidence shows, that certain steps involved in the previous methods remain involved with the use of the Anderson method and apparatus, e. g., the premixing of resin catalyst and resin accelerator in such manner that, upon mixing with the fiberglass—the hardening process—gel time—will occur quickly enough to fix the reinforced plastic in place in the mold.

It should also be pointed out that a need remains for a secondary operation after the deposit of the plastic to com-

pact it and to get rid of the air bubbles by rolling, screeding or patting down.

Plaintiff's case for novelty is, therefore, limited to the single point of the simultaneous, as distinguished from the previous two step, depositing of fiberglass roving with resin binder to form a reinforced plastic article.

Anderson, according to plaintiff, was the first to make possible with spraying into place of a durable structural material in one single operation—a method better than the previous cumbersome, dirty methods. Plaintiff expresses the Anderson idea by posing this question: "If I (Anderson) could simultaneously cut glass, hit it with two converging sprays in the air and, so wetted, deposit it on a vertical surface."

This new method and apparatus is accomplished by teaching the mounting on a single frame of a rotary cutter or chopper suited to cut or sever and eject the fiberglass (previously well known to the prior art and not claimed per se by Anderson) with a dual spray gun suited to spray catalyst and accelerator mixtures (previously well known in the art and not claimed per se by Anderson) so that the ejected fiberglass and the sprayed resins, mixing in the air, are deposited upon a mold to form a laminate of reinforced plastic.

Plaintiff concedes that this is a classic example of simplicity and that it might cause one to wonder why it eluded the art.

PRIOR ART—SIMULTANEOUS FIBER EJECTING, CUTTING AND SPRAYING

This is especially true because the broad concept of simultaneously ejecting fibers and spraying them with liquid binders was old in the art. The two Brennan patents, No. 2,596,364 (Ex. 115–a) and No. 2,408,038 (Ex. 115), show such simultaneous ejection and spraying of fibers, e. g., cotton, rayon, kapok, pulp and other textile fibers, in conjunction with liquid binders, e. g., resins and plastics, in the manufacture of loud speaker diaphrams.

The Beatty patent No. 1,881,345 (Ex. 117), shows the simultaneous ejections of sand, and spraying it with converging sprays of tar or asphalt binder. The Lampe patent No. 2,433,463 (Ex. 121) shows ejection of asbestos fibers (mixed with a dry mineral binder) out of a hand held spray nozzle in conjunction with liquid sprays of water and a latex binder. The McDonald patent No. 2,370,-408 (Ex. 120) shows the simultaneous ejection of cork particles and spraying with latex binder.

Even more closely in point with the present case, the concept of combining the steps of simultaneously cutting or severing the fiber into small lengths, ejecting the fibers and at the same time spraying them with liquid binders was old in the art. Puchacz No. 2,262,576 (Ex. 130), and Dolbey, No. 1,990,585 (Ex. 122), which were not considered by the patent office, and Bacon No. 2,-702,261 (Ex. 112), which was considered by the patent office, and Thompson No. 2,950,421 (Ex. 129) which was cited by the patent office but overcome by the filing of an affidavit under Patent Office Rule 131 (a subject to be hereafter discussed)—all show the combination of the steps of cutting or severing fiber into short fiber lengths while simultaneously ejecting the fibers and spraying them with liquid binder just prior to deposit on a desired mold or other surface. Puchacz, supra, teaches these simultaneous steps in conjunction with the spraying of a two component plastic binder (latex and a latex coagulant).

Further, as already noted, equipment used in the preform (matched metal die) method, with which Anderson was familiar, was based on the Bacon Patent, No. 2,702,261, supra, which comprised, not only a cutter element, but a resin impregnator element as well. This equipment cut the glass strands into short fiber lengths, conveyed them to a plenum chamber and deposited them in random fashion on a perforated mold (through which a vacuum was drawn) and also impregnated the fibers with a spray of suitable resin adhesive to bind the fibers

loosely together—(Tr. 3009–3012), thus accomplishing the simultaneous cutting, ejecting and impregnating of fiberglass just prior to deposit on a mold. The reason for a further step in this preform (matched metal die) method was that only a small amount of resin was used to loosely bind the fibers together so that the form could be placed between the matched metal dies.

Plaintiff concedes that it regards Bacon as showing to this extent the simultaneous cutting of glass fibers and spraying of binder on the fibers before deposit. (Tr. p. 4157).

There is evidence that all six claims of Anderson '125 and claim 11 of Anderson '345 can be read upon this prior art—(Dolbey, Tr. 3219), Puchacz (Tr. 3220), Thompson (Tr. 3161) and Bacon (Ex. 112).

Plaintiff argues, however, that certain of these prior art references, wherein is disclosed the concept of simultaneously ejecting and spraying fibers and other materials with liquid binders before deposit, e. g., the Brennan patents, supra, Beatty, supra, Lampe, supra, and McDonald, supra, and certain of the references further showing simultaneous cutting, ejection and spraying, e. g., Puchacz, supra, and Dolbey, supra, all relate to non-analogous arts having no resemblance to the field of reinforced plastics, pointing out that Puchacz involved a process of making stuffing material by means of non-glass fibers, e. g., vegetable and other fibers with binders of latex and other adhesives; that Dolbey involved a process of making interior decorative and acoustical surfaces by means of non-glass fibers, e. g., asbestos and wool, with a binder solution of powdered resin, turpentine and water; that Lampe involved a process of making acoustical ceiling coating by means of non-glass fibers, asbestos mineral wool, with binders of bentonite or latex; that Brennan, No. 2,408,-038 involved a process of making loud speaker diaphrams by means of non-glass fibers, e. g., cotton or rayon flock or wool with binders of resins, lacquers, latex and varnish; that Beatty involved non-glass material, e. g., sand, with a binder of asphalt; that Hansen involved a process of applying a latex coating to shoes; that McDonald involved a process showing non-glass material, e. g., cork particles, with a latex binder.

On this point of distinction over this prior art it may be noted that the Anderson disclosure of July 22, 1953, upon which plaintiff relies, stated that "This invention relates to a method of making fiber reinforced plastic articles. The fibers are usually, but not necessarily, glass; the bonding plastic is usually but not necessarily, of the alkyd polyester type of resin."

The only mention of fiberglass or resins in the Anderson patent appears in its recitals concerning the prior art. The claims, themselves, are not limited to the glass fibers or resins.

The Rand form of general license agreement purports to license for the use of "fiberglass, or other fiber or material, deposited by the apparatus or method sub-licensed hereunder" and, further, purports to exclude from the license the "bituminous field" which is therein defined as "the production or use of material wherein the principal binder is in the form of tar or asphalt and particularly materials in roof construction, water proofing and insulation coating and road construction, utilizing tar or asphalt type of compositions as the principal burden" —the field, as already noted, of the Beatty patent.

Although plaintiff contends that the language was inserted merely as a further assurance, the license to Flintcote, covering use of that company's so-called Sealzit gun, does in fact purport to grant a non-exclusive, royalty free license in this "bituminous field" to Flintcote.

Plaintiffs, nevertheless, take the position in this case that the claims of Anderson, read with its specifications, are to be construed as limited to the deposit of fiberglass with resin binder and that, therefore, prior art showing the simultaneous deposit of other fibers or materials mixed with other binders or ad-

hesives is non-analogous and cannot be considered to anticipate Anderson.

Whether prior art should be deemed non-analogous and too remote in a particular case depends upon the similarity and purposes of the arts involved in the sense that, if the elements and purposes in one art are so related and similar to those in another art that the relationship would appeal to the mind of a person having mechanical skill and knowledge of the purposes of the other art, then the arts may be said to be analogous. Stearns v. Tinker & Rasor, 220 F.2d 49 (9th Cir. 1955).

Although we believe that, regardless of the materials used in and the end purposes of these prior arts, the essential idea, apparently well known and variously applied, of simultaneously cutting, ejecting and spraying fibers and other materials with binders would be reasonably within the knowledge of and appeal to the mind of a person having mechanical skill in the reinforced plastics field, it is not necessary to rest this case entirely upon such a finding.

The Thompson patent, supra, involved a method for producing reinforced plastic, resinous or like structural bodies—the identical field of the Anderson patent in suit—and cannot be ruled out on the ground of being non-analogous.

Plaintiff takes the position that this Thompson patent, cited by the patent office as an anticipation of Anderson, was effectively overcome by the filing of Anderson affidavits under Rule 131—a subject to be later considered.

Plaintiff further contends, however, that in any event the claims of Anderson are not readable on Thompson, relying upon the testimony of plaintiff's expert, Horten. Plaintiff's expert, Foster, testified to the contrary and to the effect that all six claims of the Anderson patent '125 as well as claim 11 of the Anderson patent '345, can be read upon Thompson and further, that Thompson shows and describes, and also claims substantially the identical invention as set forth in the claims of Anderson. '125 (Tr. 3161).

Plaintiff, conceding that this Thompson patent shows a method for producing reinforced plastic by simultaneously cutting fiberglass into smaller lengths ejecting it and spraying them with resin binder before deposit of the mixed material on a surface, contends that it does not anticipate Anderson because—(1) Although there is a nipple through which a binder accelerator may be added, there is no mention of the use of a catalyst in the resin pot, and—(2) Although the fiberglass is shown being cut and ejected, mixed with the binder, the mixed material moves more or less parallel against the surface. As to the use of the catalyst, plaintiff's expert conceded that it was reasonable to assume that catalyst would have been premixed with the resin in the pot just as Anderson must first mix catalyst with this resin supply to provide the catalyst element. As to the manner of emergence of the material mixed in air within the pipe nozzle 31, the process seems to be a striking equivalent of what is accomplished by Anderson.

Thus, the evidence is to the effect that Thompson anticipates Anderson unless Thompson was effectively overcome by Anderson's affidavit filed under Patent. Office Rule 131.

The remaining prior art—Bacon, supra and Stotler, supra, upon which were based the Turner and Brenner fiberglass cutter devices with which Anderson was familiar, and also the Slayter cutter patent, supra, and Pasche, upon which was based the two component Schori spray gun, with which Anderson was familiar, are also concededly within the reinforced plastic field.

As to this last mentioned prior art references plaintiff takes the position that they relate only to the separate steps involved in the previous two step method of making fiberglass reinforced plastic—the Bacon, Stotler and Slayter patents relating only to the cutting or severing and ejecting of the fiberglass, and the Pasche-Schori spray gun relating

only to the spray of the two component polyester resin. Therefore, plaintiff argues, this last mentioned prior art cannot be read upon and does not anticipate, the Anderson combination of these elements.

Assuming, that the Anderson patent be construed to teach and claim something novel in method or apparatus over these prior art references—Thompson, Bacon, Stotler, Slayter and Pasche-Schori —and assuming that, therefore, this prior art does not read upon and does not strictly anticipate Anderson, the teaching and disclosure of this prior art remains, nevertheless, pertinent on the issue of obviousness and invention.

Apart from evidence of single prior art references, e. g., Thompson, there is also evidence of several combinations of certain prior art references, for example, the combination of the Stotler type cutter with the Schori type spray gun (Def. Ex. 146) and the combination of the Slayter type cutter with the Lampe type spray gun. (Def. Ex. 152).

■ The combining of two or more references for the purpose of showing obviousness is not only allowable but quite common. Griffith Rubber Mills v. Hoffar, 313 F.2d 1, 5 (9th Cir. 1963).

Assuming availability of fiberglass roving and of the necessary resin catalyst and accelerator mixtures, there is evidence that these combinations would be suggested to one skilled in the art— or in mechanics—who wanted to cut and eject fiberglass roving while at the same time spraying it with two component resin binder for deposit on a mold to form a reinforced plastic article.

To the argument that existence in the prior art of the Brenner and Turner fiberglass cutters and the fiberglass cutter patents—Bacon, Stotler, Slayter, supra, on the one hand, and availability of the Pasche-Schori two component spray gun and the spray gun patents—Hansen, Mantel and Semtex, supra, on the other hand, made the mounting or use of one with the other for simultaneous operation obvious to one skilled in the art, plaintiff replies that the apparent ob-

viousness of such conjoint use is negatived by the failure of anyone in the reinforced plastic field to do so.

This position, of course, assumes that others did not have the concept of simultaneously cutting or severing fiber, ejecting the fibers and spraying them with liquid binders. However, as shown by the prior art above mentioned, others did have such concept, not only in related fields, e. g., Puchacz, Dolbey, but also in the field of fiberglass reinforced plastic, e. g., Thompson.

Plaintiff's position also fails to consider the effect of evidence in the case that others had not only conceived, but had actually used the concept of mounting or using a fiberglass roller-cutter arrangement with conventional, two component spray gun to accomplish the simultaneous cutting, ejecting and spraying of fiberglass with polyester resin binders to form a laminate of fiberglass reinforced plastic.

## ACTIVITIES OF UTILITY, BRADLEY AND OTHERS

The activities of Utility Trailer Co., Bradley and Paramount Studios, as shown by the evidence, show that, regardless of whether their work constituted anticipation of Anderson, they did independently come up with the same basic idea, apparatus and method as Anderson and put the idea to use for their particular purposes as soon as fiberglass roving became available.

In the latter part of 1950 Utility Trailer Co., having seen a fiberglass plastic boat but believing that the mat hand lay up method would not be suitable for its work, decided to chop fiberglass roving, which was just becoming experimentally available, and spray it with resin binder with a view to making reinforced plastic trailer exteriors.

Planning to start with small parts, mainly trailer corner caps, they borrowed a cutter from Owens Corning Co., and used it mounted on a pipe harness frame with an ordinary paint spray gun.

They then decided that they needed a smaller hand held cutter so they built one

and by mid-1951 they were using such a cutter (Plft. LA Ex. 4) with a conventional Schori type two component spray gun purchased for the purpose.

This cutter and Schori gun were used conjointly—one held in one hand and one held in the other—to simultaneously cut fiberglass roving into shorter lengths, and spray the cut fibers with the two component resin binder, actually, if not intentionally, wetting the cut fibers in the air just prior to deposit on a mold to form a laminate of fiberglass reinforced plastic as exemplified in Def. Ex. 150.

By this method and apparatus they succeeded in making trailer parts, among which were some 18 inch corner caps six of which were installed upon three trailers sold to South West Freight Lines in the regular course of Utility's business. (Tr. 582–590). Later, when two of these caps were reported damaged in use by an accidental contact, the caps were replaced for the customer with caps made by the same method and apparatus.

There can be little doubt about the essential facts of this prior use which is established by credible evidence both oral and documentary.

Plaintiff contends, however, that the manufacture of these trailer caps was purely experimental and that, therefore, this work cannot be considered as a prior use anticipating Anderson.

It is true that the evidence shows that, when these fiberglass reinforced plastic caps were installed on trailers sold to its customers, Utility kept a tab or record of their use. The evidence, however, is also to the effect that this was done, not because of any dissatisfaction with the plastic trailer caps as such, or with the method or apparatus by which they were made, but because Utility was interested in finding out how plastic parts on the exterior of a trailer would stand up in use.

The evidence is further to the effect that Utility eventually concluded from its service reports and its examination of several of the caps damaged in service

that plastic material, as distinguished from generally used steel or aluminum, was not functionally suitable for exterior use on trailers because of its tendency to crack on accidental contact and its vulnerability to diesel fumes. For this reason Utility became "disenchanted" with plastics and—although to avoid the expense of new metal dies for the making of a new design of metal cap for ordered trailers—Utility purchased several hundred plastic caps on the market—it had lost interest in the making or the use of plastics. That this was the reason for loss of interest is supported by evidence that the trailer industry has never pursued the use of plastics for trailer exteriors.

Plaintiff contends that this discontinuance of interest and work with plastic establishes the work of Utility as having been abandoned because of inability to solve the technical problems involved.

It is true that testimony in the record indicates that Utility was never completely satisfied with its results in the making of plastic. It was constantly experimenting with the gel time of resin components—a problem that remains involved with the deposit of plastic by any method. It had trouble with plastic sticking to the mold—a problem which, according to the evidence, was of Utility's own making and due mainly to its use of a gummed up mold rather than a clean one.

The evidence further shows that Utility regarded as essential the elimination of residual blisters or air bubbles without need for any post deposit hand rolling down, patting or screeding and that it admittedly failed to solve this particular problem.

However, as already noted, this problem was never solved by Anderson—nor has it ever been solved in the industry by plaintiff Rand or defendant Peterson or anyone else. (Tr. 710–711).

The testimony of the witness, Bennett of Utility Co., was to the effect that he and his co-worker, Barker, disagreed on the essentiality of eliminating the need

for this secondary operation. Barker, according to Bennett, wanted to acknowledge the need for such an operation but Bennett insisted that in order to keep costs down they would have to deposit the material with virtually no secondary handwork. In his testimony Bennett states that he was unrealistic in hoping to accomplish that and they never did achieve this result.

Barker testified that he believed it was impossible to go on without a secondary operation to eliminate the air bubbles and that he was unable to accomplish this particular assignment. Only in this limited sense was Utility unsuccessful. It tried to accomplish too much.

That Utility was otherwise satisfied with its results is manifested by the fact that they had decided to file a patent application, had written up their device in great detail (LA Ex. ———) and had sent it to their patent representative who advised them to defer action until he could see the process himself in day to day operation. Meanwhile, Utility had lost interest in plastic for trailer exteriors.

The witness White, a salesman for Owens Corning Co., testified that in 1950–1951 he observed the device and the method being used at Utility trailer—the hand held chopper to cut air directed fiberglass roving, into smaller lengths and simultaneously mixed in the air with a two component resin spray from a Schori type dual spray gun. He identified LA Ex. 4 and LA 10 as the apparatus which he saw and further testified that he, himself, used the chopper, someone else holding the spray gun, to simultaneously deposit the chopped strands and resin binder on surfaces. He testified that Utility Trailer had made a lot of progress but that they subsequently lost interest in this particular development project.

Defendant's expert, Foster, testified that the Utility device (Plft. LA Ex. 4 and Plft. LA Ex. 10) used as exemplified in Def. Ex. 154, can be read on all of the claims of Anderson '125, except claims 1 and 2, and that the only reason why it cannot be read on these claims, which are apparatus claims, is that the cutter is not shown mounted on a common frame with the spray gun as shown by these apparatus claims of Anderson. However, patentable invention certainly cannot be held to consist in merely making a bracket to mount a cutter on a spray gun—a mechanical step that would be obvious to any mechanically skilled person who wanted to accomplish the simultaneous operation in that manner rather than by holding the chopper and the spray gun separately. According to the evidence Utility had earlier tried a device in physical conjunction but changed because it found more flexibility of operation by holding the cutter and the spray separately.

Turning now to another claimed prior use, there is evidence that Bradley, a small manufacturer of plexiglass aircraft windshields, occupying shop quarters at his brother's Fort Lauderdale, Florida airport between September, 1951 and January, 1953, had previously been making his molds with plaster of paris spraying the plaster of paris and simultaneously cutting and ejecting a string reinforcement by means of a homemade cutter—2 rubber rollers, one with a blade cutter mounted on the spray gun (Ft. Lauderdale Ex. 6) so that the spray of plaster of paris (and water) mixed in the air with the cut string before deposit on a surface to make a mold. Having heard of fiberglass reinforced plastic boats, he bought some resin and fiberglass cloth, tried the two step hand lay up method, became dissatisfied with the brief pot life of resin components used in that method, and then decided to apply the principle of simultaneous deposit with resin and string. Finding that string would lose its strength as a reinforcement, he next tried fiberglass instead of string. As already noted, fiberglass roving was not commercially available in 1951 and for this reason Bradley had to obtain his first fiberglass strands by unraveling the fiberglass cloth.

Finding that the blade cutter, which had previously served to cut string, wore out too fast with fiberglass, he constructed another device which, according to his testimony, was substantially Ft. Lauderdale Ex. 4, made in December, 1951 and operable in early 1952, as exemplified in Def. Ex. 153, to simultaneously cut and eject fiberglass and spray it in the air with two component resin binders to deposit a laminate of fiberglass reinforced plastic for the manufacture of molds for aircraft windshields.

There is evidence that this Bradley device can be read upon the claims of Anderson.

■ Plaintiff contends, however, that the evidence of this prior use is insufficient to meet the required standard of proof—substantial evidence, clear and satisfactory. (Whiteman v. Mathews, 216 F.2d 712 (9th Cir. 1954); King Gun Sight Co. v. Micro Sight Co., 218 F. 2d 825 (9th Cir. 1955); Tucker Aluminum Products, Inc. v. Grossman, 312 F. 2d 293 (9th Cir. 1963)).

It is true that the physical device, Ft. Lauderdale Ex. 4, was admittedly modified in numerous respects since its original construction as might be expected of a shop tool used for nearly 7 years. Although this fact reduces the reliability of Ex. 4 as a physical exhibit, the evidence indicates without contradiction that none of the modifications were such as would affect the basic structure or operation of the device.

The witness Craddock, who visited the Bradley airport shop in January and in May, 1952, testifies that Ft. Lauderdale Ex. 4 seemed the same as he saw on those visits, describing two guns on a frame with a windmill razor blade cutter on top of it spraying resin and chopping fiber.

The witness Kinnard testified that in May, 1952, he visited the Bradley airport shop and picked up from Bradley a sample by which to machine "Two sets of Schick blade retaining disks holders as per sample—material furnished by customer," this transaction being corroborated by his invoice dated June 2, 1952 and identified Ft. Lauderdale Ex. 4 as the device he saw on that occasion, describing a tube for a glass chopper between two sray guns, and an operation intermingling fiberglass with resin.

The witness, Alexander, a pilot who frequently visited the Bradley airport shop during the period, testified to seeing Bradley operating a device to make windshield molds, relating the time of his observations to a Bradley automobile accident otherwise established by a doctor's record as having involved hospital treatment in early 1952. Although this witness did not mention any chopper or cutter, as such, he described a twin head spray mixing two kinds of agents in the air to make molds that looked darker than the earlier plaster of paris, and shredded plastic shavings on the floor, which Bradley identified as fiberglass roving.

It is true that the evidence of this Bradley prior use is in some respects in conflict and subject to different inferences, e. g., concerning the sending by Bradley in 1960 of photographs of the Ft. Lauderdale Ex. 4, marked "1953" in ink, along with photographs of his later 1960 Glass Mate depositor, to his attorney in connection with a plan to obtain a patent on the latter—an inconsistency explained by Bradley as an error made long after the event without checking and later corrected to 1952 by reference to records and incidents; the testimony volunteered by Bradley that Kinnard sent back the sample blade holder by mail or Greyhound bus explaining how Bradley could have been using the device when Kinnard called to deliver the new holders; the failure of Bradley to testify to the addition of a new rear bearing until shown that the cutters would not otherwise have fitted the device; the impeachment by Horten as to whether Bradley told Horten in a 1961 interview that the device or the molds or both were kept secret.

Assuming Bradley's possible interest in the outcome of the case, he did not appear to the Court to be a dishonest witness. He was able to satisfactorily explain all points raised during an inten-

sive finetooth combing of his testimony. His testimony is not without corroboration. There is oral testimony of witnesses, whose suggested interest in the case is either remote or non-existent, and there is documentary evidence which, although not conclusive, is corroborative and significant.

The Court does not feel that this evidence should be rejected as insufficiently substantial, clear and convincing upon the central point that in early 1952 Bradley had put together a device, substantially Ft. Lauderdale Ex. 4, and used it without suppression or concealment in his airport shop in a manner substantially exemplified in Def. Ex. 153.

We concede that this Bradley prior use evidence might be rejected if subjected to the exacting, almost prohibitive "beyond a reasonable doubt" test used in the related case of Ibis Enterprises, Limited v. Spray-Bilt, Inc., So.Dist.Fla., 1963, 220 F.Supp. 65, p. 75.

Another instance of early work based on the idea of simultaneous ejection of fiberglass and spraying it with resin binder comes into the record through the witness White, a salesman for Owens Corning Co., who testified that as early as 1948 Paramount Studios, which had been using fiberglass mats by the hand lay up method to form props for movie sets, wanted to mechanize the process, obtained fiberglass roving—not then commercially available—by tearing fiberglass mats apart, and blew the fiberglass tufts through a tube mixed in the air with a plaster-resin binder before deposit and made finished products from molds—plaster rocks, etc.

As already noted, this witness, White, also testified to observance of the 1950–1951 work at Utility Trailer Co.

There is also the testimony of the witness, Smith, an acoustical engineer-executive with Acoustics, Inc., who testified that between 1949 and 1952 his firm was using, and still uses today with minor modification, an apparatus based on the Lampe Patent (Ex. 121) as exemplified in Def. Ex. 147, to card or fluff asbestos fibers (mixed with a dry mineral binder) deliver the separated fiber to the central opening of an anular hand held nozzle from the outer opening of which are sprayed water and latex binder to simultaneously intersect, wet, mix and react with the dry asbestos fiber to deposit the mixture on a surface to build up a laminate of desired thickness on vertical wall surfaces, overhead ceilings or curvatures—an apparatus and a method of simultaneous carding fibers and spraying with binder quite comparable with a typical fiberglass spray up apparatus and operation. (Def. Ex. 149).

Even if these early activities of Utility Trailer, Bradley, Acoustics, Inc., and Paramount Studios be disregarded as prior uses per se, they are pertinent to the issue of obviousness and lack of invention in Anderson.

This evidence shows that as soon as roving was available at least two other persons, Utility and Bradley neither of them as skilled in the art of making reinforced plastic as Anderson and none of them as familiar as Anderson with the Turner and Brenner glass cutter devices used in the fiberglass perform plastic art, came up independently with the idea of using a small homemade fiberglass cutter mounted with or used conjointly with a conventional dual component spray gun to accomplish the simultaneous cutting, spraying and deposit of fiberglass and resin binder to form a plastic laminate. Another, Paramount, applied the same idea for ejecting fiberglass tufts and spraying with resin binder and another, Acoustics, Inc., and in a related field, applied the same idea to the simultaneous carding of asbestos fiber and spraying with latex binder.

Further, all of these activities resulted in the production of commercial articles at least five years before Anderson, or the assignees of his patent, ever produced a single commercial part.

## THE THOMPSON PATENT AND PATENT OFFICE RULE 131

Reference has been made to plaintiff's contention that the Thompson patent,

cited in the patent office as an anticipation of Anderson, was overcome as an anticipation by the filing of Anderson's affidavit under Patent Office Rule 131.

Rule 131 provides that "When any claim of an application is rejected on reference to a domestic patent which substantially shows or describes but does not claim the rejected invention, * * * and the applicant shall make oath to facts showing a completion of the invention in this country before the filing date of the application on which the domestic patent issued * * * then the patent or publication cited shall not bar the grant of a patent to the applicant, unless the date of such patent or printed application be more than one year prior to the date on which the application was filed in this country."

The Thompson patent application date was March 31, 1953, more than five months prior to the Anderson '125 application filing of August 6, 1953.

Anderson filed an affidavit with the Patent Office to the effect that certain photographs and drawings disclosing his invention were introduced into the United States from Canada on July 23, 1952, over a year before his patent application but about eight months before the Anderson application.

Pointing out, however, that the rule is effective only when the earlier application filing substantially shows or describes, but does not claim, the same invention as the later filing, defendant has introduced evidence to the effect that claim 8 of the Thompson patent is to the same invention as claimed by claim 4 of Anderson '125, (Tr. pp. 3158–3166) with the single qualification that, although Anderson does not specifically set out "Passing severed lengths of roving between intersecting jets of air to separate individual fiber strands from one another", as does Thompson, such a separation of fibers is inherent in the structure and operation of Anderson.

■ This evidence is sufficient to support a conclusion that the patent office withdrawal of Thompson as an anticipation of Anderson was not warranted by Patent Office Rule 131. Whether the patent office withdrawal of Thompson as a citation against Anderson '125 was upon the ground that Thompson did not claim the same invention as Anderson within the meaning of Rule 131 or upon the ground that Thompson did not substantially show or describe the same invention does not appear. There is, however, evidence in this case that, as already noted, the disclosures and descriptions of Thompson do substantially show and describe the Anderson invention.

Further, in any event, Thompson is cumulative evidence to the effect that the Anderson device, even if novel, was obvious and lacks invention.

## OBJECTIVE FACTORS

This background of prior art and prior use is such that plaintiff in the present case leans heavily upon certain objective, as distinguished from so-called subjective tests, which, it contends, are applicable here to test patentable invention within the meaning of 35 U.S.C. § 103 as interpreted and applied in such cases as Lyon v. Bausch & Lomb Optical Co., 224 F.2d 530 (2d Cir. 1955) and Kaakinen v. Peelers Co., 301 F.2d 170 (9th Cir. 1962) —the meeting of a long felt want, in an industry, attempts by others to solve the problem without success, notable advancement of the art by affording new uses and better, less costly, less wasteful methods, immediate and widespread acceptance by the industry and commercial success.

■ These objective factors are unquestionably relevant to the issue of invention and they should be considered and given the full weight to which they are entitled in each particular case.

Considering first the evidence in the present case concerning a long felt industry want, it should be borne in mind that the art of making fiberglass reinforced plastic articles is a comparatively new art dating back no earlier than 1946–1947, and, further, that fiberglass in the form of roving was not available to the

art until 1951 and then only on an experimental basis.

Any significant want for the particular apparatus or method claimed by Anderson could not have begun to be felt in the industry until about 1951. Even if such a want then became immediately recognizable and felt in the industry, it would be reasonable to expect that Anderson, who claims to have conceived his method and constructed a device about that time, would have responded to that want. As defendant points out, Anderson was no closeted theorist working single handed in the field of reinforced plastic. He was aligned at that time with commercial enterprises which held commercial rights for Canada and the United States, Canadian Ingersoll Rand, Ltd., of Canada, and later with Polyfibre, Ltd., which were presumably anxious to respond to any such significant want in the industry for the spray-up apparatus and method disclosed by Anderson. In July, 1952, a disclosure was introduced into the United States with a view to patent and in August, 1953, the application was actually filed. Although the Anderson apparatus and method were presumably perfected by that time, the record in this case is devoid of evidence that Anderson, Canadian Ingersoll Rand, Ltd., Polyfibre, Ltd., or anyone else connected with the patent recognized or responded to any such industry need. Nor is there evidence that any commercial part or article was ever made by the Anderson device, Ex. 4, during a period of nearly five years thereafter.

It was not until mid-1957, when Anderson brought his device, Ex. 4, to plaintiff, Rand Development Co., and demonstrated his method in connection with the spray up of some boats that consideration was given to commercial development. Plaintiff, Rand, upon obtaining the necessary rights from Anderson, Canadian Ingersoll Rand and Polyfibre, Ltd., did begin to make other plastic articles about October, 1957, but they were made, not with the Anderson device, Ex. 4, but with a newly designed Rand device, Ex. 6.

One of the differences between this Rand device, Ex. 6, and the Anderson device, Ex. 4, is that the Rand device eliminated the hard outer surface nylon backup roller shown in Anderson, Ex. 4, and substituted the traditional soft surface rubber backup roller used in the prior cutter art and also used in the accused Peterson cutter element.

Thus, the question is raised whether the commercial success claimed by plaintiffs is in fact attributable to a device constructed according to the Anderson patent '125 of which Anderson's original device, Ex. 4, was an exemplar.

On this point the evidence shows that Anderson believed he might improve over the prior cutter art by using instead of the traditional prior art soft rubber surface backup roller, a hard surface backup roller of metal, nylon or plastic, but an original claim 8 concerning such a hard surface backup roller feature was cancelled in the patent office.

Nevertheless, the Anderson patent '125 as prosecuted and as issued recites in its specifications and shows in its drawings that "the driven roller (23) must present a surface hard enough to enable the cutting blades (27) to effectively cut the roving and yet the roller as a unit must be sufficiently elastic, or resilient, to prevent expressive cutting of the roller itself * * *. In furtherance of this end the driven roller 23 comprises an outer sleeve 29 of, for example, thin metal or hard rubber based plastic, as shown, mounted on a relatively flexible inner core, or bobbin, 30 * * *. Consistent with these requirements, the core 30 is formed of a relatively soft and resilient material; a compressible rubber such as sponge rubber can be used in which case the core is formed such that space is available into which the material of the core may be displaced by movement of the sleeve 29."

In the course of processing the application Anderson emphasized that "it is essential to provide a relatively hard surface against which the cutter blade can act to sever the rope, making it difficult to cut, so that a relatively hard cutting block is required."

The correspondence also shows that this specification was drafted after discussion between Anderson and his patent counsel in which Anderson stressed and insisted that the other sleeve of the driven roller must be hard. (Tr. 3562–3).

Further, there is evidence of significant, substantial difference in results between use of the traditional soft surface rubber backup roller on the one hand, and a hard surface backup roller, the former being many times more efficient in terms of blade usage and vastly less costly than Anderson's (Ex. 4) hard nylon backup roller.

Against this background plaintiff Rand, when about to commercialize the patent in 1957, redesigned the device to eliminate the hard nylon backup roller of Anderson's device and adopted the traditional soft rubber backup roller for the reason that glass really cannot be cut but only broken or severed. Attempts to use the Anderson hard surface nylon backup roller had produced a disappointingly short life for the cutter blades—only 100 pounds of roving before dulling the blades. (Tr. 3233).

Plaintiff takes the position that the claims of Anderson should be construed without limitation as to hardness of the outer sleeve of the backup roller in relation to a soft inner core because claims need not be construed in every detail in accordance with the drawings and specifications.

While this may be true under certain circumstances, it is the law that claims should be construed in the light of drawings and specifications. The question, therefore, remains one of construction.

In view of the mandatory language of the specifications above quoted, in view of the file wrapper history and in view of evidence that no commercial response to any need of the industry was attempted until this mandatory specification was rejected in practice, we conclude that the Rand device, Ex. 6, should not be now held in fact to embody the teaching of Anderson patent '125.

In any event, it was not until 1957 that Anderson, and the commercial enterprises who had rights in the device, evidenced any recognition of an industry want—a want which for that reason seems to have been either non-existent, insubstantial, or, at least, certainly not long felt. That this is the only reasonable conclusion is suggested by the absence of any substantial contrary evidence tending to show any such long felt industry want.

Turning now to a consideration of the record in the present case concerning claimed unsuccessful attempts by others, to solve the problem described in the Anderson patent, the Court is unable to find any evidence that others had unsuccessfully tried to simultaneously cut, eject and spray fiberglass roving—once it became available—with resin binders to form a plastic article.

As already noted, others, e. g., Utility Trailer Co., Bradley and Paramount studios attempted to do this very thing as soon as they contrived to unravel fiberglass mat or cloth or otherwise obtain roving and they did it successfully to the extent of making articles for commercial use at least five years before any such articles were made by the Anderson device or any method.

That these pioneers of 1951–1953 encountered difficulties, some poor results and some limitations is quite understandable in the light of evidence in this case that fiberglass in the form of roving was a new material and, further, that resins, although then available for mixing catalyst and accelerator, had to be adapted in the mixing to the spray up method which as conceded by plaintiff's expert, Stivalla, does involve some differences of gel time.

The witness, Dorst, who had long practical experience with fiberglass reinforced plastic, mainly boats, testified that in 1951–1953 it would have taken time, trial and error to develop practical resin mix formulae suitable for the spray up device. The witness, Eldred, an executive of plaintiff Rand Development Co., testified that even as late as 1957 in plaintiff's

work with the Anderson apparatus, Ex. 4, as redesigned by Rand to Ex. 6, Rand had to run a series of tests with resins to see how they would work with the apparatus and that they got some poor laminating results. Resin mixtures especially prepared for the spray up method use were not then commercially available—as they later came to be.

The witness, Geiger, who visited Rand Development Co., in 1957, testified that Rand was still trying to improve the apparatus particularly in the respect that the cutting knives got dull too fast and that for this reason Rand switched to Schick razor blades and to rubber roller instead of the hard nylon roller. Further, as already noted, no one seems to have ever been able to eliminate the need for secondary patting, screeding, or rolling to get rid of residual air bubbles.

These difficulties, poor results, and limitations did not arise out of unsuccessful attempts to combine a cutter, suggested by the prior art, with a spray gun, also suggested by the prior art, but rather, they arose because this obvious combination was being otherwise successfully achieved in a new industry. It must be borne in mind that Anderson does not claim the cutter as such, nor the spray gun as such, nor does he claim to be the inventor of roving nor does he claim to be the inventor of two component resin mixtures nor does his patent disclose or teach any particular method of selecting or using either roving or two component resin mixtures with his apparatus or method.

Turning now to a consideration of the evidence concerning advancement of the art, this evidence shows, and defendant concedes, that the so-called simultaneous spray up method of making fiberglass reinforced plastic articles or surfaces, and the apparatus for accomplishing this, are useful in the industry, especially for making large plastic articles, e. g., boats, cabs, domes or similar large articles in quantity or on site or for applying an extensive plastic surface, e. g., plastic coating the bows of oil tankers or swimming tanks. The evidence shows that for this type of manufacture the so-called spray up method makes possible substantial saving of time, cost and material.

Even for this type of manufacture, e. g., boats, the evidence, mainly the testimony of the witness Dorst, a boat manufacturer who tried but later abandoned the spray up method, shows a difference of opinion and practice concerning the relative advantages and disadvantages of the so-called spray up and hand lay up methods.

The testimony of the defendant, Peterson, whose business includes both the making of plastic articles and also the sale of the accused Peterson apparatus, known as the Glass Hog (the cutter) and the Twin Tip (the spray gun), shows that Peterson, himself, since 1957, refusing to acknowledge validity of the Anderson patent, uses the spray up device and method for about 50% of his particular type of work, and, further, that in his sales literature he extolls the advantages of his spray up apparatus for many purposes. Thus, Peterson has run the risk of an adverse finding on the validity of the Anderson patent.

That Peterson, himself, had not invented a device for the spray up method between 1951 and 1959 is a circumstance which the Court has considered but it is not by any means either a conclusive or a compelling circumstance on the ultimate issue of patentable invention.

The evidence, however, does not show that the spray up apparatus or method have in any sense revolutionized the industry. The prior hand lay up and preform methods continue to be preferable for certain types of work and the estimate is in evidence that on the whole hand lay up still accounts for about 45% of plastic manufacture, preform for about 40% and the spray up for only about 5%.

Turning now to the evidence in this case concerning widespread acceptance by the industry and commercial success, it appears that in 1957 plaintiff, Rand Development Co., made an announcement to the industry that was carried through some 300 trade journals and that this

announcement brought many inquiries and responses. In due course Rand obtained 173 licensees. It further appears, however, that of these 173 licensees, 72 actually paid nothing in royalties and that 97 paid less than $100 each and that of these 173 licensees 146 have since been cancelled or have become inactive. We may assume that these cancellations and inactives have been due in part to this litigation.

From 1957 to 1963 plaintiff, Rand, has received royalties under these licenses in the total amount of $554,111. Of this total one licensee, Larson Boat Co., later Brunswick Boat Division, which took a license in November, 1957, and continued under it until cancellation in September, 1962, paid royalties in the amount of :$345,000.

The Flintcote .Co., which became a licensee of plaintiff, Rand, after discussion of claims made by Rand that Flintcote's so-called Sealzit spray up apparatus might possibly be an infringement of Anderson, paid Rand $100,000 upon taking the license by way of settlement and subsequently paid actual royalties in the sum of $3,500.

· It thus appears that these two licensees account for nearly $450,000 out of a total of $554,111 received by plaintiff, Rand, from all the licenses which it obtained.

In addition to royalties, plaintiff, Rand, has received since 1957 to date, a total of $353,508 from the sale of its redesigned version of Anderson Ex. 4.

■ For these foregoing reasons the Court concludes that the present case does not come within the rationale of Kaakinen v. Peelers Co., supra, wherein certain objective factors were held sufficient to sustain validity of a combination patent—a shrimp peeler device—and to show patentable invention over prior art where the shrimp canning industry was at least three quarters of a century old, where shrimp had always been picked by hand, where for at least five years before the patent attemps to pick shrimp by machine had not been successful in eliminating hand picking and where the patented device immediately revolutionized the industry by virtually eliminating hand picking. The rationale of that decision seems to be summed up in the Court's statement that under such circumstances any "[m]ere skill of the art would normally have been called into action by the generally known want."

■ When it is claimed as indicia of invention that there was a long felt want for the advantages of the claimed invention and that the patented device met with prompt commercial success and partially displaced prior art device, the Court must bear in mind that, although such factors may tip the scales in favor of invention where the question is close and the Court is in doubt, they are at the most what our Ninth Circuit has described as a "weak reed for a patentee to lean upon" and that, where invention is clearly lacking, they do not make for patentability. Farr Co. v. American Air Filter Co., 318 F.2d 500 (9th Cir. 1963), citing Altoona Publix Theatres v. American Tri-Ergon Corp., 294 U.S. 477, 488, 55 S.Ct. 455, 79 L.Ed. 1005 (1935); Paramount Publix Corp. v. American Tri-Ergon Corp., 294 U.S. 464, 474, 55 S.Ct. 449, 79 L.Ed. 997, (1935); Photocart v. Photo Patrol, 189 F.2d 625 (9th Cir. 1951); McCord Corp. v. Beacon Auto Radiator Co., 193 F.2d 985, 989 (1st Cir. 1952).

■ The Court must also bear in mind that the function of a patent is to add to the sum of useful knowledge and that patents cannot be sustained when, on the contrary, their effect is to subtract from former resources freely available to skilled artisans. A patent for a combination which only unites old elements with no change in their respective functions obviously withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men. Farr Co., supra, citing Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 146, 147, 71 S.Ct. 127, 95 L.Ed. 162 (1950).

■ When nothing tangible is new and invention, if it exists at all, is only

in bringing old elements together, the conjunction or concert of known elements must contribute something. Only when the whole in some way exceeds the sum of its parts and is not the usual result of uniting elements old in mechanics is the accumulation of old devices patentable. The parts must perform some different or additional function or their combination must produce unusual or surprising consequences for one schooled in the particular art. Hutchinson v. Pacific Car and Foundry, 319 F.2d 756 (9th Cir. July 2, 1963), citing Griffith Rubber Mills v. Hoffar, 313 F.2d 1 (9th Cir. 1963); Pressteel Co. v. Halo Lighting Products, Inc., 314 F.2d 695 (9th Cir. 1963) and Great A. & P. Tea Co. v. Supermarket Equipment Corp., 340 U.S. 146, 71 S.Ct. 127, 95 L.Ed. 162 (1950).

■ Although there is a presumption of validity arising from the opinion of the patent office, which may be strengthened by the opinion of a district court, the responsibility remains for each court to determine whether the claimed invention is patentable. The presumption is by no means compelling especially where a great deal of the prior art was not before the patent office. (See, Pressteel v. Halo Lighting Products, Inc., supra). The Supreme Court has laid down the rule that a combination of old elements is patentable invention only if the elements take on some new quality or function by being brought into concert or their combination results in unusual or surprising consequences. The responsibility for determination of that question cannot be abdicated to another agency or court. Farr, supra, citing Kwikset Locks, Inc. v. Hillgren, 210 F.2d 483, 487–489 (9th Cir. 1954).

The Court has also considered Pursche v. Atlas Scraper & Engineering Co., 300 F.2d 467 (9th Cir. 1962) wherein the Court held that a certain broad claim of a combination patent on a two way plow embodied certain old elements so combined with a hydraulic cylinder that it functioned differently and more efficiently and with greater maneuverability than similar plows in the crowded prior two way plow art wherein for half a century inventors and mechanics had been striving for improvement in the respect provided by the patent, was both novel and inventive, citing Robinson on Patents, Vol. 1, Secs. 154, 156, upon the distinction between a mere aggregation and a patentable combination.

The Court held (300 F.2d p. 475) however, with respect to certain other claims of the patent that, where the elements of the claims were found in various prior patents and no new, surprising, functional relationship arose from the combination, the claims should not be sustained.

The Court has also considered Coleman Co. v. Holly Mfg. Co., 233 F.2d 71, (9th Cir. 1956), wherein the Court held that a certain patent for a gas burning wall heater embodied certain old elements so combined around a secondary heat exchanger as to cooperate in a new way to produce a new, useful and unexpected dual heat passing function never embodied in prior wall heater apparatus—a surprising consequence which others in an old and crowded art had failed to find obvious—was novel and inventive.

The Court pointed out, however, that a careful look at the prior art patents in evidence made it impossible to conclude that creating the compact wall combination in suit would have been a simple, obvious and fairly easy chore for a skillful mechanic familiar with room heating problems.

All of these uses involved some ingenious arrangement of old elements to produce a new, surprising, useful result never before accomplished in old crowded arts.

■ The Court agrees with the rationale of these cases to the effect that a patent for a device on a method should not be invalidated merely by the process of piecemeal attempts to show that each of the separate elements in the combination can be found in one or various prior art references—if the combination or arrangements of the elements is in fact both ingenious and useful.

In the pending case the evidence leads the Court to conclude that what Anderson did in 1951 and claimed in 1953 was not the result of any inventive genius, but the ordinary response of one skilled in the art to the advent of fiberglass in the form of roving—the mechanical mounting of a somewhat smaller version of the prior art fiberglass cutter principle and device with the prior art dual component spray gun to accomplish the simultaneous cutting, ejecting and spraying of resin impregnated fiberglass upon a principle already conceived and applied in the fiberglass plastic and other closely related fiber deposit arts without any different or additional function in the parts or any surprising or unusual result in the combination that would not have been obvious to others skilled in the mechanical arts who desired at the same period to do the same thing with the same available materials.

The Court is of the opinion that to hold such to be patentable invention would be to diminish the resources that should be left available for the exercise of mechanical skill upon old elements as essential materials become available in a comparatively new field. Everything that is new and useful does not necessarily become the subject of patentable invention and the monopoly that goes with it.

If Anderson had devised something new in the cutter or in the spray gun or had accomplished something surprising or unusual in the combination of the two —beyond the normal functioning of the parts in a mechanical combination—the situation would, of course, be different.

Where, however, the claim of invention rests, not upon a new ingenious arrangement of old elements, but, as in the pending case, upon taking a prior art cutter, admittedly known and used in the art and complete in itself, to mechanically combine it with a dual spray gun also admittedly known and used in the art and complete in itself, to operate them conjointly, such accomplishment, of itself, should not in the opinion of this Court be held patentable invention—especially where the claim is asserted in a new industry dependent for its gradual advancement upon new forms of essential material, e. g., fiberglass in the form of roving, and better understood mixtures of resin reactants.

Such a combination, as in the pending case, may result, and in fact does result, in the "simultaneous" deposit of resin impregnated fiberglass upon surfaces but such is the obvious, mechanical result of the conjoint use of the old cutter and the old spray gun.

In the absence of some claim of singular novelty in the cutter, or in the spray gun, or in both, this result is attributable only to the mechanical mounting together or conjoint use of the two known elements.

It is difficult for this Court to understand why a person skilled in the plastic or related fiber binder art or even in mechanics, desirous of using a prior art fiber glass cutter conjointly with a prior art dual component resin spray gun, would not expect the rather obvious result, namely, "simultaneous" cutting, ejecting, spraying and deposit of fiberglass, impregnated with dual component resin, for deposit of a plastic lamina. Such a result is in no way unusual or surprising.

The ultimate result achieved by such a conjoint operation would depend more upon the amount, kind and quantity of the materials and mixtures used, the angle or point of convergence, and the kind of lamina in mind than upon the mere conjoint use of two well known elements. The Anderson patent '125 claims and teaches only the latter. There is no claim or teaching concerning, for example, the angle or point of convergence. The patent drawings and descriptions, and the Anderson apparatus, itself, show that the spray gun nozzles are pivotly mounted in such manner as to enable the operator to adjust the angle and point of convergence.

To say that, without more, such a mechanical combination of the cutter and the dual spray gun constitutes invention would be in effect to foreclose persons of ordinary skill in the art or in mechanics

—persons like Utility and Bradley in the pending case—from conjointly using a small version of the old cutter with the old dual spray gun as available materials and certain particular uses might suggest.

We believe that on the whole the present case falls within the rule well stated in Griffith Rubber Mills v. Hoffar: "It follows that though a device may be new and useful it is not patentable if it consists of no more than a combination of ideas which are drawn from the existing fund of public knowledge, and which produces results that would be expected by one skilled in the art. A public grant of the private power to exclude others from making, using, and selling such a device simply 'withdraws what already is known into the field of its monopoly and diminishes the resources available to skillful men.' No balancing public benefit results from such a patent since the fund of freely available public knowledge is reduced during the period of monopoly, and is only restored rather than enhanced when that period ends. * * * Although no single one of the elements of the total prior knowledge embraced the whole of Hoffar's muffler, we think the difference between their sum and Hoffar's combination of them was unsubstantial and that his advance must be held to have been an obvious one to a person skilled in this art.

"There was no objective evidence that the combination was less obvious than it appears. There was no showing that Hoffar's muffler dealt with a problem which had concerned the industry over a substantial period and which others had sought to solve without success. So far as was shown, Hoffar was the first to make an all-elastomer muffler with a slit-baffle wall only because he was the first skilled in the art who directed his attention to the problem of creating an effective muffler that would not corrode."

ANDERSON '125—INFRINGEMENT

Defendant contends that in any event, the accused Peterson device does not infringe any of the claims of Anderson '125 or claim 11 '314 because it does not have a hard backup roller as called for by the claims of Anderson construed in the light of the Anderson drawings and specifications.

It is undisputed in this case that the accused Peterson Glass Hog—Twin Tip device utilizes, not a hard outer sleeve of metal or plastic, but a soft rubber outer sleeve, nor does the Peterson device utilize a relatively soft, resilient core. (Tr. pp. 1704–1709).

It is well established that, if a discovery or invention has advanced the art substantially, a Court should be liberal in its construction to secure to the inventor the reward he deserves. But, if what an inventor has done works only a slight step forward and that which he says is on the border line between mere mechanical change and real invention, then his patent, even if sustained, will be given a narrow scope and in construing specifications and finding equivalents infringement will be found only in approximate copies of the new device. Eibel Process Co. v. Minnesota & Ontario Paper Co., 261 U.S. 45, 63, 43 S.Ct. 322, 67 L.Ed. 523 (1923).

In the present case we have found that what Anderson did was not invention at all. If it was, it was at best on the border line between mere mechanical change and real invention and, if it worked some step forward in the art, the patent should be construed narrowly rather than liberally.

For reasons already mentioned on this subject the Court concludes that the accused device should not be now held to be either an approximate copy or substantial equivalent of a device constructed under Anderson '125.

Defendant further contends that the accused Peterson device does not infringe any of the claims of Anderson '125 or claim 11 of Anderson '314 because it does not embody the single unitary frame structure to which both the cutter and the spray gun (and motor) are firmly and commonly mounted as called for by the claims of Anderson.

The Peterson device comprises three frame pieces, the first of which comprises a frame for the spray gun, the second of which comprises a frame for the cutter and the third of which is in the form of a detachable mounting bracket.

The file wrapper shows that Anderson distinguished certain of his claims from the prior art upon the point that his device included "a frame" which the cutter, motor and spray were mounted.

Defendant also contends that the second Peterson device does not infringe any of the claims of Anderson '125 of '314 because it does not embody a cutter directly between and coplaner with the spray gun nozzles which are widely spaced apart from each other and located on each side of the cutter as called for by the claims of Anderson.

The Peterson device, when cutter and spray gun are mounted together, positions the cutter vertically above the spray gun in such manner that the cutter is not located either between or coplaner with the spray gun.

As already noted, Anderson has testified, that when he saw the Schori spray gun in 1951 and considered it for his own use, he concluded that the Schori spray would not be suitable because he could see no way of introducing the chopped fibers between the converging sprays as the Schori gun was designed and that a problem of control would be presented. (Tr. 3326, 3327).

However, the spray gun element of the Peterson device is quite similar in design and assembly to the Schori spray gun in that both use closely spaced spray nozzles as distinguished from the Anderson widely spaced spray nozzles.

We have held that the "simultaneous" deposit method of Anderson is essentially attributable to the mechanical mounting of a cutter and a spray gun (with motor) upon a frame for conjoint use—a combination which in our opinion is non-patentable.

If we assume, however, that such mechanical mounting of the elements upon a frame is patentable invention, then, it would in our further opinion, be at best on the border line between mere mechanical change and real invention subject to narrow interpretation and infringable only by approximate copies.

In this view of the matter we are of the opinion that the accused device is neither an approximate copy nor a sustantial equivalent of Anderson in the two last mentioned respects.

A difference of design in Peterson, which accomplishes control when the cutter and spray elements are mounted together and at the same time permits demountability for separate use if control of the elements so requires, is in our opinion a substantial difference.

ANDERSON '314 (THE IMPROVEMENT PATENT) CLAIM 11—VALIDITY—INFRINGEMENT

Claim 11 of this improvement patent, Anderson '314, claims two improvements:

First, "a pair of feed rollers in parallel spaced relation to each other for engaging roving there between."

Plaintiff broadly construes this claim to charge infringement by the accused device, the Glass Hog cutter elements, Plfts. Ex. 19, which utilizes a single brass roving support roller in frictional contact against a backup roller.

This arrangement of the cutter-roller element of the accused device is so practically identical with the arrangement of the corresponding element in the prior art cutters—Bacon, No. 2,702,261 and Stotler No. 2,719,336—that, if plaintiff's construction of Anderson '314, claim 11 in this respect be adopted, the claim would be clearly invalid for anticipation by Bacon No. 2,702,216 and Stotler No. 2,-719,336. See Defs. Ex. 151, comparing the Anderson-Bacon-Peterson (Ex. 19) devices in this respect and Defs. Ex. 148, comparing the Anderson-Stotler-Peterson (Ex. 19) devices in this respect.

Plaintiff attempts to point out some difference between the organization and angle of Peterson, on the one hand, and Bacon and Stotler on the other, which renders Anderson '314, claim 11, readable

826

on Peterson in this respect. However, we are unable to observe any patentable distinction between them which is claimed in Anderson as its claims are construed by plaintiff.

Nevertheless, for the purposes of this case, the court is inclined to hold that claim 11 of Anderson '314, which plaintiff concedes to be a minor improvement patent, should in any event be construed narrowly and that, so construed, the claim is not infringed in this respect by Peterson as an approximate copy.

This is especially true for the reason that the difference in this respect between Peterson (Ex. 19) and the claims, drawings and specifications of Anderson is not merely superficial, suggesting equivalence, but substantial in that the Anderson patent and device teach a principle of "free wheeling" arrangement of the feed rollers while Peterson is based on the principle of frictional integration of the feeder and cutter elements—a principle applied, as already noted, in Bacon and Stotler, supra.

The second improvement claimed by Anderson '314 is "guide means on the frame to direct the roving between the support rollers to various points along the length of the cutters"—a claim which, if valid, would be infringed by similar equivalent means utilized in the Peterson accused device, Ex. 19.

However, this element of the claim is clearly invalid for anticipation by the prior art cutter device based on Stotler, No. 2,719,336, which used similar guide means except that the guide means of Stotler were pegs and the guide means shown in Anderson are holes performing the same function in substantially the same way. (See Ex. 148).

CONCLUSION

This Memorandum indicating that judgment should be for the defendant on certain issues of validity and infringement, is not intended to constitute the formal findings and conclusions of the Court but is expressly filed subject to the preparation, service and presentation of proposed findings, conclusions and judgment by defendant herein, for settlement by the Court, which proposed findings and conclusions, prepared in the light of this Memorandum, shall meet the requirements for findings and conclusions in patent cases. (See: National Lead v. Western Lead Products Co., 291 F.2d 447 (9th Cir. 1961; Welsh Co. of Cal. v. Strolee of Cal., 290 F.2d 509 (9th Cir. 1961)).

Further, this Memorandum of Decision is subject to correction, modification and supplementation by the Court pending settlement of findings and conclusions.